# MICHAEL CLANCY v. ST. LOUIS TRANSIT COMPANY, Appellant.

### Division One, January 16, 1906.

1. **NEGLIGENCE: Merging Inconsistent Charges in Same Count.** The plaintiff should not in the same count of the petition charge common-law negligence in running a street car and ordinance negligence in running the car at an excessive rate of speed, for the two are inconsistent; and if they are blended in the same count, it is error to overrule a motion to elect. [Per MARSHALL, J.]

2. **IMPEACHING ONE'S WITNESS: Artifice.** The motorman had made two written statements to defendant's officers and his deposition had been taken by plaintiff. He had quit the company's service, but for sometime prior to the trial had been seeking re-employment. The case was taken by change of venue to another county, and two weeks before the trial he went to the office of plaintiff's attorney and made and signed a statement which contradicted his former statements and deposition. He was taken to the trial by plaintiff's attorney and his railroad fare and hotel bills paid by him, which fact defendant knew, but did not know that he had made the last statement. Plaintiff did not call the witness, but defendant did. His deposition was such that, if true, plaintiff is not entitled to recover, but his testimony at the trial was such that, if true, defendant was guilty of gross negligence. *Held,* that defendant should have been permitted to impeach the witness, and to cross-examine him to the extent of laying a foundation for introducing the deposition, and prior statement, and to otherwise expose the artifice practiced both by the witness and plaintiff's attorney.

3. **NEGLIGENCE: Observing Car's Approach: Mental Abstraction.** A person working in a trench being constructed for gas mains, over which street cars frequently pass, has no right to be so engrossed in his work as not to listen or look for or otherwise observe the approach of a car. It is his duty to look and listen, and if his failure to do either resulted in his being struck by the car he cannot recover for his injuries.

4. ————: ————: **Working Near Track.** A trench was being dug across a street in which to lay gas mains, and plaintiff was working in a trench from two and one-half to four feet deep between the tracks, and leaning against the rail or stooping over near thereto was struck by a passing car. The car was running

rapidly and no attempt was made to stop it, but all the witnesses testify either that the gong was sounded or that the noise of the car was sufficient to attract attention, and the evidence indicates that by taking a step or two plaintiff could have avoided being struck. *Held*, that, it was negligence for the plaintiff to remain in dangerous proximity to the track, and in such a position that he could not see the approaching car, and to take no precautions whatever looking to his own safety, and conceding the negligence of the company, and that plaintiff was so absorbed in his work that he did not look, he cannot recover for his injuries.

Appeal from Boone Circuit Court.—*Hon. John A. Hockaday*, Judge.

REVERSED.

*Boyle & Priest* and *J. W. Jamison* for appellant.

(1) There is no pretense that the injury was wantonly or willfully inflicted. Upon his own showing plaintiff was not entitled to recover and the court should have directed a verdict for defendant. Davies v. Railroad, 159 Mo. 1; Maxey v. Railroad, 113 Mo. 1; Jones v. Barnard, 63 Mo. App. 501; Vogg v. Railroad, 36 S. W. 646; Evans v. Railroad, 178 Mo. 517. Plaintiff's position was similar to, but more dangerous than that of one employed as a "section man" to work on steam railroads. Evans v. Railroad, supra. Nor was plaintiff entitled to go to the jury upon the theory that although he may have been guilty of negligence which directly contributed to his injury he was nevertheless entitled to recover if defendant's employees knew of his peril or by the exercise of ordinary care might have known thereof in time to have enabled them by the exercise of ordinary care to have averted the injury. This rule cannot be applied under the facts and circumstances developed by the testimony in this case. Evans v. Railroad, 178 Mo. 517; Ries v. Railroad, 179 Mo. 1; Ferguson v. Traction Co., 9 Pa. Co. Ct., 147. Plaintiff's position in the trench was such that it was necessary for

him to exercise greater care than would be ordinarily expected of section men, because the latter work above ground and are generally in a position where they must necessarily be seen by the engineer. (2) There was error in refusing to permit defendant to impeach the witness Bray. Having the deposition of witness and two written statements in its possession from him detailing the facts with respect to the collision and no notice that witness had subsequently made an experiment, and had gone to plaintiff's counsel and made contradictory statements, and no notice that he would change his testimony at the time of the trial, defendant should have been permitted to impeach him upon the ground that it had been entrapped into offering him, and that defendant had been imposed upon and misled. Dunn v. Dunnaker, 87 Mo. 597; State to use v. Martin, 52 Mo. App. 511; State v. Burks, 132 Mo. 363. (3) There is an irreconcilable conflict between instructions 1, 2 and 3 given at the instance of plaintiff. Furthermore, the law as declared in those instructions cannot be reconciled with the law as announced in the instructions given for defendant. Such repugnant directions afford no guide to the jury, nor can it be presumed that they follow one rather than the other. Desnoyers Shoe Co. v. Lisman & Ramsey, 85 Mo. App. 344; Linn v. Massillion Bridge Co., 78 Mo. App. 111; Baustian v. Young, 152 Mo. 317; Goetz v. Railroad, 50 Mo. 472; Worthington v. Railroad, 72 Mo. App. 162.

*Taylor R. Young, Frank H. Haskins, Stern & Haberman* and *N. T. Gentry* for respondent.

(1) The court committed no error in refusing defendant's instruction in the nature of a demurrer. The verdict was fully supported by the evidence. Seckinger v. Mfg. Co., 129 Mo. 590; Gessley v. Railroad, 32 Mo. App. l. c. 418; I Thompson on Negligence, 461; Church v. Railroad, 119 Mo. 218. (2) The court committed

no error in refusing to permit defendant's counsel to read to the jury the testimony of witness Bray as contained in his deposition, and in refusing to permit defendant to prove the contents of two written statements made by Bray prior to the trial, for the following reasons: (a) Bray was defendant's own witness, and it is not competent for a party to impeach his own witness even in case of surprise. Clafflin v. Dodson, 111 Mo. 195; Brown v. Wood, 19 Mo. 475; Dunn v. Dunnaker, 87 Mo. 597; Putnam v. U. S.,162 U. S. 687; Sanchez v. People, 22 N. Y. 147; People v. Sanford, 5 Denio 117; Com. v. Hudson, 11 Gray 64; Com. v. Walsh, 4 Gray 535. (b) The courts have sometimes permitted a party to ask his own witness if he has not on a previous occasion made contrary statements, but this is only done where it is shown to the satisfaction of the court that the party had been trapped or surprised by the witness. State v. Burks, 132 Mo. 374; Feary v. O'Neill, 149 Mo. 473. (c) Defendant was not trapped or surprised by the witness. (d) A party cannot ask his own witness if he has not made previous contradictory statements when he puts the witness on the stand knowing him to be infamous or of bad character. 2 Philips on Evidence (5 Am. Ed.), p. 981; Rapalje on Witnesses (Ed. 1887), sec. 212, p. 532. (e) It is within the discretion of the trial court whether or not to permit a party to ask his own witness whether he has not made previous contradictory statements, and the decision of the trial court is final, and a refusal to allow the question is not ground for reversal. Hurlburt v. Billows, 50 N. H. 115; State v. Squires, 48 N. H. 368; Selover v. Bryant, 21 L. R. A. 433; Hirsch v. Green, 83 Mo. App. 489; Greenleaf on Evidence (15 Ed.), sec. 435, p. 570. (f) Defendant was permitted to cross examine Bray and voluntarily waived his right to question him regarding previous statements made by the witness. (g) The deposition with which defendant wished to contradict Bray does not contain anything contradictory to his testimony.

(h)   The purpose of permitting a party to ask his own witness whether he has not made previous contradictory statements is solely for the purpose of refreshing the recollection of the witness, or of awakening his conscience, and cannot be done for the purpose of impeaching him.   Bullard v. Pearsall, 53 N. Y. 230; Hurley v. State of Ohio, 4 L. R. A. 163; Creighton v. Modern Woodmen, 90 Mo. App. 378; Railroad v. State to use, 41 Md. 295.   (i)   Evidence aliunde cannot be introduced for the purpose of showing that the witness has made previous contradictory statements.   Collins v. Hoehle, 75 N. W. 416.   (j)   Before a party can ask for a reversal upon the ground that an objection to the question has been sustained, he must make an offer of proof showing to the court what he intends to prove by the witness, and this offer must be properly made. Jackson v. Hardin, 83 Mo. 179; Hickman v. Green, 123 Mo. 179; Lyon v. Batz, 42 Mo. App. 606; Wheeler v. Rice, 62 Mass. 205.   (3)   The instructions given at the request of plaintiff merely state the law, and if they are in conflict with those given on behalf of defendant, then the latter are erroneous, and a party cannot complain of self-invited error.   Christian v. Ins. Co., 143 Mo. 460; Nagel v. Railroad, 104 Mo. App. 438; Goetz v. Railroad, 50 Mo. 472.   (4)   The "humanitarian doctrine" applies in this case.   Evans v. Railroad, 178 Mo. 517; Fearons v. Railroad, 79 S. W. 398; Jett v. Railroad, 77 S. W. 740; Klockenbrink v. Railroad, 172 Mo. 678; Morgan v. Railroad, 159 Mo. 275; Lynch v. Railroad, 111 Mo. 601; Fiedler v. Railroad, 107 Mo. 651; Guenther v. Railroad, 108 Mo. 18; Scullin v. Railroad, 83 S. W. 760.

MARSHALL, J.—This is an action for $20,000 damages received by the plaintiff on the 3rd of July, 1902, at a point on Shenandoah avenue, between Thurman boulevard and Vandeventer avenue, in the city of St. Louis, in consequence of one of defendant's cars striking the plaintiff while he was engaged at work on

the street between the double tracks of defendant's road, and while he was standing in a ditch that had been dug, at that point, for the purpose of laying gas pipes. A change of venue was taken by the plaintiff from the city of St. Louis, and the case was sent to Boone county, where the plaintiff recovered a judgment for $10,000, and the defendant appealed.

THE ISSUES.

The petition charges the corporate capacity of the defendant, and alleges that it was engaged in operating street cars in the city of St. Louis, particularly at the point where the accident occurred; that on the day of the accident, the plaintiff was engaged as an employee of the Laclede Gas Light Company, in laying pipes under the tracks of the defendant, at said point, "and while in a stooping position between the two tracks of the defendant, at said time and place, the plaintiff was struck," etc.; that the defendant's servants in charge of the car knew that the plaintiff and several employees of the gas light company were engaged in laying pipes under the defendant's tracks, and "saw, or by the exercise of ordinary care and diligence in keeping a lookout for plaintiff and other persons on the track could and would have seen, plaintiff in time, by the exercise of ordinary care, to have stopped said car so as to have prevented said injuries, and by reason of such carelessness and disregard of duty on the part of defendant, its servants, agents and employees, and in failing to keep proper lookout for persons on its track at said time and place, and in failing to stop said east-bound car in time to avoid said injuries, plaintiff was struck and injured as aforesaid.

"Plaintiff further alleges that said injuries were caused by the aforesaid negligence and carelessness, and also by defendant's agents and servants in charge of said car, failing to keep a vigilant lookout for all persons on foot, either on the track or moving towards it,

and on the first appearance of danger to persons, to stop said car in the shortest time possible; and in running said car at a greater rate of speed than eight. miles an hour, as required by subdivision four and ten, respectively, of city ordinance 1275, relating to running street cars''—the ordinance relied upon being set out; that the city granted to defendant the right to lay its street car tracks on Shenandoah street, and in accepting the grant, the defendant assumed the obligation to obey said ordinances; that the plaintiff was rightfully on the track of defendant, because his employer had obtained from the city a permit to lay its gas pipes; that said work was being done with the knowledge and consent of the defendant; that the injuries complained of ''were caused by the aforesaid carelessness and negligence of the defendant's servants, and also by the defendant permitting its motors and brakes, for the operation and stopping of said east-bound street car, to become defective, out of order and repair, by reason of which said car could not be stopped in time to avoid his said injuries. Plaintiff further says that his injuries were caused, in part, by the negligence of the defendant's servants in failing to ring the gong, or give him any other warning of the approach of said car;'' that plaintiff's injuries consisted of a fracture of the skull, which will render him an invalid for life; that four ribs were broken on the left side and two on the right, and he has suffered severe injuries in the back, and was otherwise severely injured, and will be crippled for life, etc.

The defendant moved to require the plaintiff to elect which one of the causes of action stated in his petition he would stand on, assigning therefor the following reasons, to-wit: ''first, because said plaintiff has improperly united in the same count a cause of action at common law, with a cause of action upon an ordinance of the city of St. Louis, commonly called the vigilant watch ordinance; second, because the plaintiff has

improperly united in the same count a cause of action arising *ex delicto,* with a cause of action arising *ex contractu.*"

The court overruled the motion and the defendant saved an exception, by filing a term bill of exceptions, and afterwards by preserving it in the final bill of exceptions.

Thereafter, on motion of the defendant, the court struck out from the petition the alleged negligence of the defendant in "failing to keep a vigilant lookout for all persons on foot, either on the track or moving towards it, and on the first appearance of danger to persons, to stop said car in as short a time as possible," and the further allegation, referring to the subsection of the city ordinance containing and setting out in full the vigilant watch ordinance, but allowed the allegation of negligence as to the violation of the speed ordinance to remain.

The answer is a general denial, with a plea of contributory negligence, in that, the plaintiff, without looking or listening for the approach of the car, "carelessly and negligently stood in the hole or excavation between the defendant's tracks, with a portion of his body a sufficient distance above the street to be struck by a car moving over the tracks, or so near to a moving car approaching on one of the tracks, that he was struck and injured, when, if before placing himself in such position, he had looked or listened for the approach of the car, he could have seen or heard the same and have avoided the injury."

The case made is this:

It was conceded at the trial that the plaintiff was an employee of the gas light company, and that said company was laying pipes at said point on Shenandoah avenue under a permit from the city; that plaintiff, when injured, was standing in one of the ditches that had been dug under the tracks, and was engaged in connecting and placing joints of gas pipes along the bot-

tom of the ditch; that defendant had a double-track street car line near the center of the street, and that said tracks were about four and one-half feet apart.

Shenandoah street runs east-and-west. Thurman boulevard and Vandeventer avenue run north-and-south, the latter being two blocks east of the former. The defendant's road runs on Shenandoah street to Thurman boulevard and turns south on the boulevard, and goes a distance of two blocks to Tower Grove Park, which is the terminus of the road. Lawrence street runs north-and-south about midway between Thurman boulevard and Vandeventer avenue. The blocks in that part of the city are six to eight hundred feet long. From Thurman boulevard to Lawrence street there is a down grade. From Lawrence street to Vandeventer avenue the grade rises. The accident occurred on Shenandoah street near Lawrence street. The main gas pipe was laid on the south side of Shenandoah street, south of the car tracks. For about a week previous to the accident, the plaintiff, and other employees of the gas light company, had been engaged in laying pipes on Shenandoah street, for the purpose of connecting the lamp posts and houses on the north side of said street with the gas main. A trench had been dug from the south side of the street to the south track. A tunnel had been dug under the track; then a trench had been excavated between the tracks, and a tunnel had been dug under the north track, and a trench had been dug in the street north of the north track. The connecting gas pipe was laid in the trenches and in the tunnels. Plaintiff was a man about six feet tall. He was standing in the trench between the two tracks, putting tile pipe over the iron gas pipe, and pushing it through the tunnel under the tracks.

The testimony for the plaintiff tends to show that the trench in which he was standing was about two feet wide, about four feet and eight inches long, and about two and one-half feet deep. The testimony for the de-

fendant tends to show that the trench was four feet long, two feet wide and four feet and some inches deep. There was some water in the bottom of the trench, and plaintiff was standing on some rocks about three or four inches thick. He was in a stooping position, facing north. While in said stooping position he was three feet ten inches in height. He was standing with one leg between the ties, which projected about eight inches beyond the rail, and his leg was against the south rail on the north track. While so stooping, he had his head down in the ditch.

From three to eight minutes, according to the difference in the testimony of the defendant and plaintiff, one of the defendant's cars which was being run by one Bray, as motorman, passed the point of the accident going west. He and Bray had known each other for some time, and were on friendly terms. As the car went west plaintiff says that Bray and he exchanged salutations, and after the car passed the plaintiff got into the ditch, and assumed the position above stated.

On prior occasions, while the work was in progress, Bray was running a car over that part of the line, and knew that the work was going on; and in passing he and the plaintiff spoke to each other, and sometimes Bray stopped his car and talked to the plaintiff. In from three to eight minutes after so going west, the car returned. The plaintiff was in the stooping position aforesaid, engaged in the work aforesaid. He says that the work was occupying his mind and that he did not see or hear the car coming; that the motorman knew they were at work at that point, and he thought the motorman would be looking out for the workmen, and would ring the gong and would call their attention to the coming car; that he was listening, but that he did not hear the gong ring, or the car coming until he was struck by the car; he says he did not stop his work at any time or look to see whether the car was approaching, but depended upon the gong being rung to notify

him of the coming of the car, which the motorman almost always did. Plaintiff, himself, had had experience, for nine months, as a motorman on the defendant road. He testified that a car running at the rate of twelve or thirteen miles an hour, if loaded, could be stopped in seventy to seventy-five feet, and if empty, from sixty to sixty-five feet; at fifteen miles an hour, could be stopped in a distance of ten feet more; that with a wet, clean rail the car would make no noise in running on the track, but would do so if the rail was dirty; that when running at the rate of twenty-two miles an hour, it could be stopped in one hundred and twenty-five feet.

The plaintiff's brother testified that he was standing three hundred to three hundred and fifty feet east of where the plaintiff was working; that he had three other men doing like kind of work east of where the plaintiff was; that he was looking towards where the plaintiff was working, and could see him from where he was standing; that he could see his entire back as he stooped over at his work; that his back extended a foot above the level of the street; that he did not see his brother at the moment he was struck, but he had seen him a few minutes before that; that there was room between the tracks for a man working there to step back and sit on the opposite rail to let the cars pass.

W. A. Smith, a street inspector of the city, testified that he was the inspector of the work that was going on at that point; that at the time the plaintiff was struck he was some fifty feet away, stepping off the curb, going toward him; that he had seen the plaintiff within a minute before he was struck by the car, when he (the witness) went for a drink of water, and plaintiff was, at that time, stooping down in the trench; that he went about fifty feet away to get water, and was gone about a minute or a minute and a half before the plaintiff was struck; that sometimes when the plaintiff was in the

192 sup—40

ditch stooping over, he could see him; that he saw the car coming when he started for the water; that the car was then about one hundred and fifty feet away, and he did not know whether it was running fast or slow, but supposed it was going at the usual rate of speed; that he saw the motorman on the car, but could not see what he was doing. When asked whether he tried to warn the plaintiff of the approaching car, he answered: "I had been there warning them all the time." And when pressed to know whether he had warned the plaintiff at that time, he answered: "No, sir; not at that time." He further testified that at all times the cars make enough noise to be heard a considerable distance off, and that it would be impossible for one of the cars to come upon you without your hearing it, if you were listening at the time. The witness admitted having previously signed a statement to the defendant company in which he had said that when he saw the car coming he called to the plaintiff to keep down, and that in that statement he said that the plaintiff could not hear his call, because of the noise of the car. On the trial he stated that he did not remember whether in that statement he had said that a man could keep out of the way of the car by stooping in the hole. He further stated on the trial that his statements to the company were incorrect in reference to the depth of the hole, and that "he would not swear he knew every word in the paper." On the trial he was asked, "If you did not halloo at him to keep down, as it is here, I will ask you why did you make that statement that he could not hear you on account of the noise? A. The car was coming along making the noise. Q. Why did you say it? A. I hallooed at him to keep him down. Q. A moment ago you swore you did not halloo to him to keep him down; you did not have time. A. I did not have time. Q. You hallooed anyway? A. Yes, sir; before I got to him. Q. That statement is true then? A. Yes, sir. Q. Your

statement, 'I hallooed at him,' is true, is it? A. Yes, sir.''

Frank Cherwick was working with the plaintiff and was in the ditch on the north side of the track, and saw the car strike the plaintiff. He says the step on the front platform struck the plaintiff, and that at that time, the plaintiff's back was about nine inches above the top of the ditch; that when he first saw the car, it was about eight or nine feet away, and that the motorman was sitting on the front of the car looking south; that the plaintiff tried to stop the car, raised his hand and waived to the conductor and hallooed to him to stop, but that the car was right on top of him, and that the motorman had time to stop the car after the plaintiff waived to him if he had been attending to his business. This witness also admitted having signed a statement made to the defendant company in which he said: ''Mike told the motorman to go slow. I don't know if the motorman rang the bell or not.'' At that point it was admitted that the defendant company had the right, under the ordinance, to run its cars at the point of the accident, at a speed not greater than fifteen miles an hour.

Jacob L. Claus, a witness for plaintiff, testified that after the accident he saw people congregating, and hurried to the place, and saw the plaintiff taken out of the ditch; that the car stopped about two hundred feet east of the ditch; that he did not particularly observe the speed of the car, and had never had occasion to observe the speed of cars, but that the car was running very fast, and its speed attracted his attention. He also testified that the ditch was three to three and one-half feet wide, about five feet long and three to five feet deep.

Hugh E. Devlin had had several years' experience as a motorman, and had visited the point of the accident two days before the trial. He stated that a car running eight miles an hour could be stopped in from twenty to twenty-five feet, and at fifteen miles an hour, could be

stopped in about seventy feet; that is, that after the brake was applied it would run seventy feet before it stopped; that it would run twenty-two to twenty-five feet after the application of the brakes, if going at eight miles an hour.

With respect to the extent of the injuries received, Dr. Douglas, who made an examination of the plaintiff the day before the trial, testified that he observed an injury to plaintiff's skull, and a fracture of his skull, and stated that plaintiff could not possibly recover from the effects of them in a short time, and it was a question in his mind whether he would ever fully recover; that while there was a depression of the skull, along the line of where the fracture was, he would not say there was any pressure on the brain.

Dr. L. Whitner testified that the plaintiff complained of a continual ringing in the ear, which was relieved by lying down; that above the right ear was a scalp wound aggravated by pressure. "It was a depression in the bone and loss of co-ordination upon the closing of the eyes, causing dizziness, probably due to an injury of the brain near the scalp and skull, the latter of which was broken. There were no objective symptoms." He said in his opinion the injuries were permanent.

Dr. W. A. McCandless testified that he saw the plaintiff immediately after the injury; that he had a lineal fracture on the right side of his head, back of and above his ear, and a lacerated wound on the scalp; that he performed the operation of trephining; that the bone did not rupture the membrane of the brain, nor was there a marked depression; "that there was no extravasation of blood, which is the result of ruptured blood vessels; that is, there was no pressure on the membrane as a result of extravasation of blood, no indication of paralysis at all, no indication of fracture of the base of the skull, no fluid escaped from the ear." He further stated, that it was very unusual for cases of that kind

not to get well, and that the dizziness of which the plaintiff complained might wear off in a little while and might continue longer, and that he was surprised that the plaintiff had not already recovered.

James McEvoy, a witness for plaintiff, after qualifying as an expert motorman, testified that a car traveling at eight miles an hour could be stopped in twenty-five or thirty feet; at fifteen miles an hour, it could be stopped at sixty-five feet, from the time the motorman first applied the brakes until the car was brought to a stop; that the bigger the load carried the easier it was to stop it; that if the rail was slick, you never can tell when it will stop.

This was the substance of the testimony on behalf of the plaintiff.

The defendant then demurred to the evidence; the court overruled the demurrer, and the defendant excepted.

The substance of the testimony adduced by the defendant was as follows:

G. W. Richardson testified that he was the conductor of the car that struck the plaintiff; that the car returned in three minutes from the time it passed the plaintiff going west; that as their car went west, the plaintiff was in the trench between the tracks; that the car was running from ten to fourteen miles an hour; that the gong was being rung at the time of the accident; and was so rung when approaching the place of the accident; that the hole was four feet long, two and one-half feet wide and four or five feet deep; that in lifting the plaintiff out of the hole he noticed that when the plaintiff's feet were on the bottom of the hole his shoulders were at about the top of the hole; that the employees of the railroad watched for men who were working at that point, and that the men also watched for the cars; that Bray, the motorman, was no longer in the employ of the defendant, having quit about six months before the trial.

J. W. Frank, a motorman for the defendant, testified that he made six trips with the car that struck the plaintiff, on the morning of the day of the accident, and that he turned the car over to Bray at 12:06 p. m.; that the equipment of the car was then in good condition; that he saw the trench in which the plaintiff was working both in the morning and in the afternoon of that day, and that the trench was three feet wide, four feet long and about five feet deep; that if the full power of the car was applied at Thurman boulevard going east, the car would be running at a speed of twelve miles an hour at the point of the accident.

W. W. Harper, the car inspector for defendant, testified that he inspected the car just before noon on the day of the accident, and that the brakes and all other appliances were in first-class condition; that he passed the trench in which the plaintiff was working twice every morning and twice every afternoon; that when he passed the trench at noon, it was four feet deep, two and one-half feet wide, and that the tracks were about five feet apart; that an empty car approaching where the plaintiff was struck, with full power on, could not be made to run faster than thirteen or fifteen miles an hour; that he had made the experiment and that was the greatest speed it would attain.

F. Deldridge, a motorman in the employ of the defendant, testified that he saw the ditch before and after the accident and that it was two by four feet on top and about three and one-half to four feet deep; that it looked that way to him as he passed on his car.

C. Turner, another motorman, testified that he passed the plaintiff a few moments before he was hurt; that he saw Bray's car about two or three hundred feet before it struck the plaintiff; that is, he met Bray about that distance west of the point of the accident; that the ditch in which the plaintiff stood was about four feet deep; that when he went west he saw some one in the hole, but he was sitting down so that he could not see

him until his car passed over him; that a motorman sitting on the stool on the front platform of the car going east could not have seen a man in the ditch, in the position the plaintiff was, at a distance of forty or sixty feet west of the ditch; that in his opinion Bray's car was running at a speed of from ten to twelve miles an hour.

M. J. Usher, a policeman, testified that he inspected the place within fifteen minutes after the accident, and measured the hole with a tape line, and found it to be four feet long, two feet wide, and four feet and some inches deep.

The defendant then called George Bray, the motorman, who testified that in returning, when he reached Thurman boulevard he picked up two or three passengers, and then started the car, after the conductor had sounded the bell twice; that he turned on the full power and ran to within about fifty feet of where the men were working in the ditch; that he saw the man on the north side of the track raise up out of the ditch; that he was sitting on the stool on the front platform, ringing the gong when he saw him raise out of the ditch; that he was running at a pretty good rate of speed, and that he turned and looked back, and when he turned and looked again, he was within eight feet of the hole, and he saw the plaintiff in the hole bending over in a stooping position, and did not have time to call to him but only time to throw off the power of the car, and the car immediately struck plaintiff; that he rang the bell five or six times with his heel, while traveling the fifty feet; that he was running at least twenty miles an hour.

He stated that his deposition had been taken in the case, and that he had also made a report to the company, on the evening of the day of the accident; that after the car struck the plaintiff it ran about two car-lengths or two car-lengths and a half; that the statement he made to the company was wrong, but he had not purposely made it wrong; that it was wrong, in that, it stated that the right-hand step struck the plain-

tiff, while in fact it was the left-hand step that struck him; that he was a personal friend of the plaintiff; that he had consulted with the plaintiff's attorneys twice before the trial.

The defendant then asked the witness this question:

"Q. In that deposition and in every statement you have made in regard to this case, you have said this man rose up and was hurt, now, didn't you?"

The plaintiff objected to the question on the ground that the defendant could not impeach his own witness. The court sustained the objection and the defendant excepted.

The witness then testified that Mr. Altheimer, one of the plaintiff's attorneys, brought him from St. Louis to Columbia, and paid his hotel and railroad bills, and that plaintiff's attorneys had not given him or promised him anything for his services. He was then asked why he had changed his statements from what he had said in his deposition, and the statements he had made to the company, and he answered: "I got on a car last Tuesday and went over the same ground, over the same place exactly that I struck this man, and I went through the same things as I did when I hit him, and I convinced myself thoroughly of the fact—I was not excited at that time at all—and convinced myself thoroughly of the fact. Q. Of what fact? A. Of the rate of speed I was running at when I hit him, and the condition he was in, and the condition I should have seen him in. Q. You convinced yourself by being on the car last Tuesday that he was not raising up when you struck him? A. I did not state it; I never said he was not raising up when I struck him. I say I cannot say whether he was raising up or not, but I say he was in a bent position at first, when I first saw him there in the hole, and I didn't see him in time to prevent hitting him. If he was raising up he would not have got much higher than when I first saw him. Q. Were you looking there? A.

The first thing I saw was the other man getting up out of the hole opposite. Q. Were you looking straight ahead of you for objects on the track? A. Not directly ahead of me. Q. What were you doing? A. I was looking at a man diagonally in front of me. Q. He was close to Mike Clancy? A. Yes, sir, in sixteen feet of him I think. Q. In the position Mike Clancy was in in the ditch, could you have seen him if you had been looking directly at that place? Could you have seen him in the position he was in, in time to have stopped the car, if you had been looking directly at that point? A. Yes, sir, I could if the dirt wasn't any higher than they said it was. Q. Could you or not? A. Yes, sir. If I had known he was in that hole and had been looking out for him, I could have seen him in time to have stopped the car before I hit him. Q. In your deposition, you swore you could not, didn't you?"

Plaintiff objected to the question for the reason that the defendant could not impeach his own witness. The court ruled that if the defendant placed the witness on the stand under a mistaken idea as to what his testimony was, and had been misled, the court would relax the rule, but on the other hand, if he put the witness on the stand, knowing he was an adverse party, he could not impeach his own witness. Counsel for the defendant then said he did not know what he would have to show in order to prove that defendant had been misled. But that if notice, that this witness had been with the plaintiff, had been brought to Columbia by him, and they had paid his expenses, then he had notice. If, on the other hand, the defendant had a right to rely on the statement made by the witness, in his sworn deposition and everywhere else, then they had been misled. The court then said, "If defendant put this witness on the stand with the knowledge of the fact"—counsel interrupted and said, "I had no knowledge of what he was going to swear to here, only what he said in his deposition, and in other statements he had

made.'' The defendant then offered to prove that the witness had made two signed statements in regard to the facts in the case, in which he said he was looking straight ahead of him at the time of the accident, and that the plaintiff rose up in front of the car instantly, and so close to the car that the motorman could not stop the car before it struck him, and that in the position the man was in in the ditch, the car would have passed over him safely, if he had not risen up; and that a man in the ditch could not have been seen by the motorman in the position the motorman occupied on the front platform of the car. The defendant then offered to read to the jury the statements of the witness made in the deposition and stated that the purpose of so doing was ''to make the record show the defendant is entitled to cross-examine this witness, and show the statements he now makes are absolutely false.'' The plaintiff still objected, and the court sustained the objection, and the defendant excepted.

The defendant then asked the witness whether he had not, pending the case, written to the assistant general claim agent of the defendant, and demanded of him money for his testimony in the case, and threatened that if he did not pay him he would make him suffer for it. Upon the objection of the plaintiff, the court sustained the objection.

On cross-examination it developed that the witness had worked for the defendant a little over seven months before the railroad strike in St. Louis; that he then went out with the strikers, and that he worked for the company about seven months after the strike, and quit in either August or September, 1902, about a month or two after the accident; that after so quitting he tried to get back with the company, and continued so to do until about two weeks before the trial; that he had received a subpoena to come to the office of the plaintiff's attorneys to give his deposition, on the day that he signed a statement; that to prevent his so being exam-

ined, the claim agent of the defendant furnished him money and sent him out of the city, paying his wages while he was gone; that he subsequently was again subpoenaed and went to the office of the plaintiff's attorneys, and there gave his deposition; that the test he had made on the Tuesday before the trial, concerning which he had testified on his direct examination, he had made of his own motion; that he went out to Thurman boulevard and Shenandoah street, and got a conductor and motorman to let him have a car with which to make the experiment; that he went over all of the steps he had testified to, and found that by putting on full power at Thurman boulevard, the car would be traveling at about twenty or twenty-five miles an hour when it reached the point of the accident; that he reversed the power of the car just as he had done on the day of the accident, and that he stopped the car in one hundred and twenty or one hundred and thirty feet; that prior to giving his deposition he had been attempting to get back on the road, but that the defendant's officer who had the hiring of men had been putting him off from time to time, and had not given him a job.

On re-direct examination he was asked, "Do you mean to tell the jury, that because you were expecting to get a job from the Transit Company you perjured yourself in making that deposition?" On objection by the plaintiff the court excluded the testimony, on the ground that the defendant could not impeach its own witness, "but he would relax the rule and allow defendant's counsel to examine this witness as if he was cross-examining him." The defendant excepted to the ruling. The question was then repeated, and the witness answered: "I didn't claim I told any falsehood. I didn't tell all I knew. I knew more last Tuesday, after I tried it, than I did before."

The witness further testified that he did not know the names in full of either the motorman or the conduc-

tor, or the passenger of the car with which he had made the experiment.

Touching the testimony that the claim agent of the defendant had sent the witness out of the city to prevent his deposition being taken by the plaintiff, the defendant asked: "Q. You say he was the man that bribed you to leave?" The plaintiff objected to any other inquiries along that line for the reason that it was incompetent, and that the manner of inquiry should be stopped. The court sustained the objection and informed the witness that he need not answer unless he wanted to, and the defendant excepted.

The witness further testified that the agent of the defendant who had the employment of its servants had not asked him what he would testify in the case, nor had he promised him any money, but that he promised him he would take him back at the first opportunity, and had put him off from time to time. He further testified that he had gone to the office of the plaintiff's attorneys and had made to them a statement which had been taken down in shorthand, transcribed, one correction made by him, and then he had signed it. This was all the testimony in the case.

The defendant then again demurred to the evidence; the court overruled the demurrer and the defendant excepted.

At the request of the plaintiff, the court instructed the jury that if the defendant's agents knew that the plaintiff was working underneath the tracks, and if the motorman saw, or by the exercise of ordinary care could have seen, the plaintiff, in time to have stopped the car, and have avoided the injury, by the exercise of ordinary care, and failed to do so, the verdict should be for the plaintiff, unless the plaintiff was also negligent, as defined in the instructions given.

The second instruction given for the plaintiff told the jury that the plaintiff had a right to work between the tracks, but that the plaintiff while so engaged in

working between the tracks, was bound to use the same degree of care which an ordinarily careful and prudent man would use under like circumstances, and if the plaintiff did use such degree of care, then he was not negligent, and the jury should so find.

The third instruction given for the plaintiff was as follows: "Even though the jury should find that the plaintiff was negligent in working between the tracks of defendant, and that such negligence directly contributed to cause the injuries complained of, still, if you further believe that the plaintiff had placed himself in a dangerous position by working between said tracks, and thereafter such dangerous position became known, or by looking, could have become known to the defendant's motorman in charge of said car, in time to have stopped said car, by the exercise of ordinary care, and avoided the injuries complained of, and failed to do so, then your verdict must be for the plaintiff."

The fourth instruction given for the plaintiff related to the measure of damages.

The first instruction given for the defendant told the jury that it was the duty of the plaintiff, while working so close to defendant's tracks as to be in danger of colliding with the car, to look and listen for the approach of the cars running over the tracks, and upon the approach of cars to step aside, and avoid being struck by the car, "and the motorman in charge of the car that struck him had a right to presume that the plaintiff would use ordinary care upon his part in looking and listening for said car, and in removing himself from the place of danger upon the approach of said car, and no duty devolved upon the motorman to stop his car until he saw, or by the exercise of ordinary care could have seen, plaintiff's danger."

The second instruction given for the defendant told the jury that if the plaintiff was working in a ditch or excavation in a stooping posture, so that the motorman by the exercise of ordinary care was unable to see the

plaintiff in the ditch, and if the plaintiff had provided no warning or means of any kind, to give notice to the motorman of his presence in the ditch, and if while so in ditch, plaintiff suddenly rose up, so close to defendant's tracks, and so immediately in front of defendant's car, as to render it impossible for the motorman, by the reasonable use of the means and appliances at his command, to stop the car in time to avoid striking the plaintiff, then the court declared as a matter of law, that the plaintiff was guilty of negligence on his part and could not recover, ''notwithstanding you may believe that the defendant was negligent in the operation of the car at the time and place of the accident.''

The instruction then told the jury that four acts of negligence were charged in the petition, to-wit: ''first, that defendant's servants and employees in charge of its car failed to stop its car in time to avoid the injury to plaintiff after they saw plaintiff's danger, or by the exercise of reasonable care and diligence could have seen the same; second, that defendant ran its car at the time in question at an unlawful rate of speed; third, that the defendant negligently permitted the motors and brakes used in the operation or stopping of its car, to become defective and out of repair; fourth, that defendant's servants in charge of its car failed to ring a gong or give plaintiff any other warning of the approach of said car.''

The court instructed the jury that the plaintiff must prove that the defendant was guilty of one or more of the special acts of negligence charged, and that if they so found the defendant was guilty, and that such negligence of the defendant contributed to the injury, still if the plaintiff was negligent and his negligence contributed to the injury, he was not entitled to recover, ''unless, you further find from the evidence that the motorman in charge of the car saw, or by the exercise of reasonable care might have seen, that the plaintiff was in a place of danger or peril, and that said motorman

thereafter could have avoided the injury to the plaintiff, by the exercise of reasonable and ordinary care, but negligently failed to do so.''

The fourth instruction given for the defendant told the jury that if the injuries were caused by the joint and concurring negligence of the plaintiff and the defendant, and that the negligence of either without the concurring negligence of the other, would not have caused the injury, then their verdict must be for the defendant.

The fifth instruction for the defendant told the jury that they were not at liberty to presume negligence against the defendant, but that the acts of negligence charged by the plaintiff must be proved by the plaintiff to the reasonable satisfaction of the jury, by the greater weight of the evidence, and unless so proved, the verdict should be for the defendant.

The sixth instruction given for the defendant told the jury that it was negligence on the part of the plaintiff to be in the place where he was injured at the time and under the circumstances detailed in the evidence, provided the place was a dangerous one, and that the plaintiff could not recover unless the jury found that after his danger was known to the motorman in charge of the car, or by the exercise of ordinary care on his part, could have been known to him, in time to stop the car and avoid the collision, and unless the plaintiff, after placing himself in such dangerous position, could not, by the exercise of ordinary care upon his part, have avoided the accident and injury complained of.

The seventh instruction given for the defendant told the jury that the defendant, under the ordinances of the city, had a right to run its car, at the time and place of the accident, at a speed not exceeding fifteen miles an hour, and unless the evidence showed that the car that struck the plaintiff was running at a speed in excess of fifteen miles an hour, the jury could not find

the defendant guilty of negligence, on account of the rate of speed the car was being run.

The jury returned a verdict for the plaintiff for $10,000, and after proper steps the defendant appealed.

## I.

The petition originally stated three different kinds of negligence in the same count, to-wit, common-law negligence, ordinance negligence, and willfulness, recklessness or wantonness, commonly called the "humanitarian doctrine." The defendant treated the petition as stating only two kinds of negligence, to-wit, common-law negligence and ordinance negligence, and accordingly moved to require the plaintiff to elect on which he would stand. The court overruled that motion. That was error. The question here involved was decided by this court, In Banc, on the 28th of June, 1905, in the case of McHugh v. Railroad, 190 Mo. 85. In that case, BURGESS, J., speaking for the court, said: "That the petition states two causes of action is, we think, clear; the first, an action at common law for negligence; the other, an action for damages alleged to have been sustained by plaintiff by reason of the alleged negligence of defendant's conductor in charge of the car in which plaintiff was a passenger, in permitting her to leave said car whilst the same was in motion, in violation of the ordinances of the city of St. Louis. They are independent of each other, and upon either an action might be maintained, but they cannot, under the rules of good pleading, be embraced in the same count. [Behen v. Railroad, 186 Mo. 430.] If embraced in the same petition they should be in separate counts, with a prayer for judgment at the conclusion of each count. When separate causes of action are united in the same petition, each must be distinctly and separately stated, with the relief sought to each cause of action in such manner that they may be intelligently distinguished." [Citing cases.] Moreover, the causes of action stated in the

petition are inconsistent, and could not be joined in the same count for that reason. [Behen v. Railroad, supra.] "While there was but one injury and there could be but one recovery for it, and any number of negligent acts preceding the injury and leading up to and contributing to it might properly be set forth in the same count of the petition, if of the same character, an action for damages at common law for negligence, cannot be joined in the same count with one for statutory negligence for the very obvious reason that they could have no possible connection with, or in any way be dependent upon, each other." [Citing cases.]

And after reviewing Hill v. Railroad, 49 Mo. App. 520, s. c., 121 Mo. 477, and holding that it did not state a contrary rule to, that announced, it was further said: "In case a petition improperly joins two different causes of action in the same count, it has always been ruled by this court that the remedy is by timely motion to require the plaintiff to elect upon which count he will proceed to trial, as was done in this case" (citing authorities); and upon this branch of the case the conclusion announced in that case was, "the motions should have been sustained."

So likewise in the case at bar, the motion to elect should have been sustained for the same reasons. The action of the court in afterwards striking out the allegations of the petition alleging a violation of the vigilant watch ordinance, did not cure the error committed in overruling the motion to elect. It partially cured that error, but it did not reach the allegations of ordinance negligence as to running the car at a greater rate of speed than fifteen miles an hour, and left such ordinance negligence as a ground of recovery, in the same count with common-law negligence, and, what the plaintiff now claims, was an allegation of willfulness and wantonness. And the plaintiff all the way through the case attempted to prove, and did introduce evidence

192 sup—41

tending to prove, that the defendant was guilty of ordinance negligence, by running the car at a greater rate of speed than fifteen miles an hour, and in the briefs, in this court, his counsel lay stress upon the fact that the car, at the time of the accident, was running at least twenty-two miles an hour, and but for the speed of the car, it could have been stopped in time to have avoided the injury, after the danger of the plaintiff became known, or by the exercise of ordinary care might have become known, to the motorman.

The theory of the plaintiff in the briefs is ·that there was common-law negligence, ordinance negligence, and wantonness in the case, and the instructions given for the plaintiff predicate a right of recovery upon both common-law and ordinance negligence and wantonness; the instructions may be construed to mean either of both. The error, therefore, in overruling the motion to elect, was not cured by the ruling on the motion to strike out, for it left the petition with both common law and ordinance negligence pleaded in the same count, and the oral testimony put the case to the jury upon both theories.

## II.

The ruling of the court with respect to the testimony of the witness Bray, is next assigned as error.

On the same day of the accident Bray made a written statement of the facts to the defendant. Again while in the employ of the defendant he made a second statement. Afterwards, his deposition was taken by the plaintiff in the case. In both of the statements and in his depositions, he stated, that at the time, and immediately before, the accident, he was looking straight ahead of him, and that the plaintiff rose up from the trench "instantly," and so close to the car that he could not stop the car before it struck the plaintiff; that in the position the plaintiff was in the ditch, the car would have passed over him safely if he had not risen up, and that occupying the position on the front platform of

the car that he did, he did not see, and could not have seen, the plaintiff in the ditch in time to have known of his danger, and to have stopped the car and averted the accident.

The case had been taken from the city of St. Louis to Boone county, on change of venue. The defendant knew that one of the plaintiff's attorneys had taken the witness Bray from St. Louis to Columbia, and had paid his railroad fare and hotel bill. Having such knowledge, and knowing that the plaintiff had not placed the motorman on the stand, after going to the expense of taking him to Columbia, the defendant, without consultation with the witness, but relying upon the two written statements and the deposition he had previously made and given, placed the motorman on the stand. The motorman then changed front entirely, and testified that the car was running at a very rapid rate, from twenty to twenty-five miles an hour; that when he got within fifty or sixty feet of the place of the accident, he commenced ringing the bell, and while covering that distance he rang it about five or six times; that he had on the full power; that, when fifty feet from the place of the accident, he saw another man rise out of the ditch, on the opposite side of the track from that on which the plaintiff was working; that he then looked back, and did not look again to the front until the car was within eight feet of the hole in which the plaintiff was; that he then threw off the power, but it was too late, and the car struck the plaintiff; that he could have seen the plaintiff in time to have avoided striking him if he had been looking in that direction; that after the accident he quit the employ of the defendant, and subsequently endeavored to get back his old job, and that defendant's agent in charge of employing the men, although promising him the first vacancy, did not comply with his promises; that about two weeks before the trial, he quit trying to get his old job back, and voluntarily went to the office of one of the plaintiff's attor-

neys, and made a statement, which was taken down in shorthand, transcribed, corrected and then signed by him; that a few days before the trial, of his own motion, he went out to the place of the accident and secured a car from a motorman and conductor, and experimented, by going through all of the various steps and acts that he had gone through with on the day of the accident, with the result that he said he had become convinced that he was mistaken in the statement he had made. When pressed to know wherein the statement was incorrect, he said that in the statement he had said the right side of the front platform struck the plaintiff, whereas, it was the left-hand end of the platform that struck him; and further, that his statement was incorrect as to his not being able to see the plaintiff in the ditch, if he had been looking straight forward; and as to his saying in the statement that he was looking straight forward, and that neither of those statements were true, and further, that the statement was wrong as to the rate of speed at which the car was traveling.

The defendant then undertook to lay the foundation for the introduction of the statements and deposition of the witness. On the objection of the plaintiff, the court excluded the questions and answers to lay such foundation, and the defendant excepted.

The defendant then offered the statements and deposition, for the purpose of showing that the witness had previously testified differently from his testimony on the stand; and for the further purpose of enabling the defendant to cross-examine the witness and show that the statements made at the trial were false. On objection of the plaintiff, the court also sustained this objection, and the defendant excepted.

On cross-examination the witness testified, that when he was first subpoenaed by the plaintiff to have his deposition taken before the trial, the claim agent of the defendant sent him out of the city, paying his wages and expenses, to keep him from testifying.

On re-direct examination, he was asked whether he had meant to say that because he had been expecting to get a job from the defendant, he had perjured himself, when his deposition was taken. This was objected to by the plaintiff, but the court admitted the question, holding that the defendant could not impeach his own witness, but that he might cross-examine him. The witness answered that he did not tell any falsehood, but that by reason of the experiment, aforesaid, he had told the truth on the trial and not in his deposition.

The plaintiff says that the last ruling, aforesaid, of the court corrected whatever error there was in the first ruling; but this is manifestly a mistake, for the matters inquired of on re-direct examination were only the matters brought out on the cross-examination, and did not cover the points attempted to be shown on the direct examination.

In sustaining the objection to the questions on re-direct examination, tending to show, or lay the foundation for showing, that the witness had testified and made written statements before the trial exactly the contrary of his testimony on the trial, and which went to the very essence of the case, both as to common-law negligence, ordinance negligence, and wantonness, the court held that the defendant could not impeach his own witness, without showing that the defendant had been misled in putting the witness on the stand. The defendant's counsel then admitted that they knew that the witness had been brought to Columbia by the plaintiff, and his expenses paid, but had no knowledge that he intended to swear differently from what he had sworn in his deposition and stated in his written statements.

The rule of law in this State applicable to such cases was clearly announced, after an extended review of the English and American precedents, by this court, in State v. Burks, 132 Mo. 363, and the conclusion there announced was: "Accordingly it must be ruled upon

the great weight of authority that a party cannot, either in a civil or criminal case, discredit or impeach his own witness by proof of contradictory statements previous- ly made by his witness, unless he has been entrapped or misled by some artifice or statement to him or to some one upon whom the party had a right to rely, or unless there is an express statute permitting such evidence.''

In that case the proof was rejected because the defendant made no effort to show that the witness had ever given defendant any reason to believe that she would testify differently from the way she did on the trial.

The question came again before this court in Fearey v. O'Neill, 149 Mo. l. c. 473, and the contrary statement, outside of court, of the witness called by the defendant, was rejected because there was no evidence tending to show that the plaintiff had used any artifice to entrap or mislead the defendant into calling him as a witness, and there was no showing of surprise, by affidavit or otherwise, taking the case out of the general rule. And State v. Burks, supra, was held not to be an authority for admitting the statement "made out of court" under such circumstances.

The question for decision, therefore, is, whether this case falls within the general rule, that a party calling a witness cannot contradict or impeach him, by showing that he has made other statements contradictory of his evidence, or whether it falls within what may be termed the exception to the rule, to-wit, that the witness, or the adverse party to the cause, has entrapped or misled the party calling the witness, by some artifice, so as to induce him to call the witness, and thereby to gain an advantage in the case over the party calling him, which the adverse party would not have had if he had called the witness.

In the case at bar the witness had made two written statements and had given his deposition concerning

the accident. In all of them he stated that he was look-
ing towards the front; that he could not see the plaintiff
in the ditch until he was so close to him that it was im-
possible to stop the car until it was too late to prevent
the injury; that the plaintiff suddenly rose up from his
stooping position in the ditch when the car was almost
upon him, and that the witness, the motorman, did not
then have time to do anything more than reverse the
power, and that even that was not sufficient to prevent
the accident, and that if the plaintiff had not raised up,
the car would have passed over him without striking
him.

The defendant knew that the witness, until a short
time before the trial, had been asking to be reinstated
in the position he had voluntarily left. It, therefore,
had no intimation from the conduct of the witness that
he was an adverse or unfriendly witness, or that he
even contemplated changing his written statements and
his sworn testimony.. The defendant did not take the
witness to Columbia, but evidently intended to rely up-
on the deposition of the witness. If the defendant had
not put the motorman on the stand, that, afterwards,
might have been used against it before the jury to the
disadvantage of the defendant. The defendant knew
that the plaintiff had taken the witness to Columbia,
paying his railroad fare and hotel bill. This circum-
stance was well calculated to put the defendant on its
guard as to the witness. But the plaintiff did not use
the motorman as a witness in his case in chief. The
plaintiff closed his case in chief without any evidence
from any witness that the motorman was not looking di-
rectly in front of him, at and immediately prior to the
accident, for the plaintiff's brother testified that he was
looking towards his brother immediately before the ac-
cident, but was not so looking at the time of the acci-
dent, and therefore could not see in what position the
plaintiff was at the time of the accident. He did not tes-
tify as to how the motorman was looking. Smith, the

other witness for the plaintiff, testified that he saw the car coming when it was one hundred and fifty feet away; that he saw the motorman on the car but could not say what he was doing. Cherwick, the fellow-laborer with the plaintiff, who rose up from the trench on the north side of the track, testified that when he first saw the car it was eight or nine feet away from him, and that the motorman was looking towards the south. This witness testified that before the car struck the plaintiff the plaintiff waived his hand to the motorman and called to him to stop, but that the motorman did not do so. The plaintiff, himself, said he had never raised from the ditch before he was struck.

The defendant, therefore, was put in this position, that although defendant knew the plaintiff had brought the motorman to Columbia, he had not used him as a witness in chief. The natural and reasonable deduction to be drawn from such conduct was that the plaintiff knew that the witness would testify as he had done in his deposition, which had been taken by the plaintiff. In fact, however, the plaintiff knew that the motorman would not so testify, because a few days before the trial, the motorman had voluntarily gone to one of the plaintiff's attorneys and made a statement, which was taken down in shorthand, transcribed and then signed by the witness, which contradicted the testimony given by the motorman in his deposition, and was exactly what the motorman testified to when called on the trial. The defendant, then, under those circumstances, without any knowledge that the motorman had become unfriendly or adverse, or had made the written statement to the plaintiff's attorneys, or had made the most improbable experiment testified to by him, was put to the necessity of either closing its case without calling the motorman and taking the consequences above indicated of not doing so, or else of relying upon the fact that, although the plaintiff had brought the motorman to Columbia, yet he did not call him as a witness in chief, and

that the reason for not calling him must have been that the plaintiff had no reason to expect that he would testify differently from what he had done in his deposition. Of course the witness being present, the defendant could not use his deposition. Under such circumstances, the defendant was entitled to call the motorman, and to rely upon his testifying the same as he had done in his sworn deposition. The action of the plaintiff cannot be accounted for on any other theory than that he knew, as the record shows he knew, that the witness had changed his attitude in the case, and that he had given him a different statement from his deposition, and that he did not put him on the stand after going to the expense of taking him to Columbia, because if he did the defendant would then be entitled to contradict him by using the deposition and written statements, previously made by him, and thus breaking the force, if not destroying the effect, of his testimony on the trial.

The plaintiff, therefore, could have had no other object in taking him there and not calling him as a witness, than to prevent the defendant from using the testimony in the deposition, and forcing the defendant to put the witness on the stand, and thereby claim that the defendant could not contradict or impeach the witness by his prior statements.

No other conclusion is possible, under the facts, thus disclosed, than that the defendant was entrapped and misled by the artifice of the witness, and of the plaintiff, and hence this case falls within the exception to the general rule, and the trial court should have admitted the prior statements and deposition of the witness. That the testimony of the witness on the trial materially aided the plaintiff and greatly damaged the defendant, is beyond controversy. The testimony of the witness as to the experiment made by him is so improbable as to create a strong conviction that no such experiment was ever made. It is highly improbable

that any motorman or conductor would have permitted the witness, without any authority from the defendant, to use one of its cars for such a purpose, and it is manifestly absurd that a motorman and conductor, whose surnames were unknown to the witness, would have permitted him so to do. The conduct of this witness throughout bears earmarks of a desire to injure the defendant because of its failure to reinstate him in his former position. No stronger case of trick and artifice, such as is contemplated by the rule of law in respect to witnesses, could be imagined, than is presented in this case. This court will never give its sanction to or approval of a verdict in favor of a party based upon testimony that has been developed in the case, under such circumstances as are disclosed by the record in this case.

The trial court erred in excluding the depositions and prior statements of the witness, and in not permitting the defendant to expose the artifice used in the case.

### III.

The giving of plaintiff's first and third instructions is assigned as error.

The plaintiff construes the first instruction to cover ordinary common-law negligence, and says that the third instruction "lays down what is commonly termed, 'the humanitarian doctrine.'"

The first instruction is evidently based upon the common-law negligence set out in the petition. The petition, after the vigilant-watch ordinance had been struck out, still contained an averment of ordinance negligence as to the rate of speed. This negligence, however, although relied upon in the production of testimony, was not submitted to the jury under any instruction whatever. The plaintiff construed the petition to also contain allegations which bring the case within the humanitarian doctrine, and the third instruc-

tion given for the plaintiff proceeds along that idea. In no proper respect, however, can it be said that the petition states a case under the humanitarian doctrine. The petition contains no allegation whatever of willfulness, recklessness or wantonness, and in fact instruction number three does not require the jury to find that the motorman was guilty of any recklessness, wantonness or willfulness. The third instruction proceeds rather upon the "last-chance doctrine," which does not obtain in Missouri, than upon the humanitarian doctrine, which does obtain in Missouri, and which requires something more than ordinary negligence to support it; that is, there must be an element of recklessness, wantonness or willfulness in the case as distinguished from mere ordinary negligence, or as distinguished from the "last-chance doctrine." There is no foundation, whatever, in the case, for the application of the humanitarian doctrine. The motorman, whose conduct comprises whatever negligence the defendant was guilty of, was a friend of the plaintiff. He knew the plaintiff had been working at or near the point of the accident, for at least a week before the accident, and in passing had exchanged salutations with him, and had often stopped his car to converse with him. In the statement given by the motorman to the plaintiff, on the 13th of January, 1903, and read in evidence by the plaintiff upon the trial, the motorman said: "Clancy was a friend of mine, and I wouldn't have struck him if I could possibly have avoided doing so." In that same statement, the motorman said that in going west he did not see any one in the ditch, and supposed the men had gone to their lunch, and that in returning within six or eight minutes thereafter, he had no idea the men had come back from lunch, and was not expecting to find any men in the trench.

There was, therefore, every natural inducement to the motorman not to injure the plaintiff, and under the circumstances there is absolutely no evidence of any

willfulness, wantonness or recklessness in the case. Therefore, both because the petition does not properly plead the humanitarian doctrine, and because the evidence affords no support whatever for the application of that doctrine to this case, the third instruction should not have been given, if it was, as plaintiff says, predicated upon the humanitarian doctrine. It rather states the "last-chance doctrine,"—not law in Missouri.

The instructions asked by the defendant and given by the court proceed on the theory that in order to entitle the plaintiff to recover the defendant must have been guilty of negligence, and the plaintiff must have been without fault, or contributory negligence, and that the plaintiff could not recover in the absence of such facts, unless the case falls within the humanitarian doctrine. The fact, however, that the defendant's instructions recognized the humanitarian doctrine cannot be construed as an aider of the plaintiff's instructions, or the plaintiff's case, for after the court had given the instructions for the plaintiff the defendant was obliged to meet the conditions thus presented in the best way it could, and overcome the error in the plaintiff's instructions, as best it could. The doctrine of aider does not apply to instructions asked by the defendant, under such circumstances.

For these reasons the trial court erred in giving the third instruction for the plaintiff.

## IV.

This leaves for consideration the ruling of the court upon the demurrers to the evidence.

The case made by the plaintiff is this: He was working in a trench about two feet wide, about four or five feet long and from two to five feet in depth, according to the testimony of the various witnesses. The trench was in the space between the two tracks of the defendant. The plaintiff knew that cars passed backwards and forwards at that point at frequent intervals. He says he got into the ditch, placed one leg between

the cross ties that projected about eight inches from
the rail, rested his leg against the rail, and stooped over
with his head below the top of the ditch, and was en-
gaged in putting tile over the iron gas pipe in a tun-
nel underneath the track. He says that a few minutes
before the accident the car that injured him passed
westwardly, and that he spoke to his friend, the motor-
man. He says he didn't observe or look to see whether
a car was coming when he assumed the stooping posi-
tion in the ditch, because he permitted his mind to be-
come engrossed in his work, and because he relied up-
on the motorman sounding the gong, to give him warn-
ing of the approach of the car, and he says he heard no
warning. His friend, the motorman, however, says
that he sounded the gong five or six times while cover-
ing a space of fifty feet before reaching the point of the
accident. His brother did not testify as to whether
the gong was rung or not. His witness Smith, the street
inspector, said that he had been giving warning to the
men of the approach of cars, and that he saw this car
coming when it was one hundred and fifty feet away,
and that he turned and went for a drink of water, and
had been absent about a minute, so engaged, when the
accident occurred. He did not say whether the gong
was sounded or not, but he did say that at all times the
cars make noise enough to be heard a considerable dis-
tance off, and that in his opinion it would be an impos-
sibility for one of those cars to come upon you without
your hearing it if you were listening at the time. Cher-
wick, the fellow-laborer, who was on the north side of
the track, working with the plaintiff in putting the tile
over the pipe in the tunnel underneath the track, said
that he did not notice the car until it was eight or nine
feet from him, and that the plaintiff then raised his
hand and hallooed to the motorman to stop, but that it
was too late for him to do so. Plaintiff's other witness,
Claus, did not see the accident, but saw people hurry-
ing to the place. He did not say whether the gong was

sounded or not, but he did say that the car was running very fast and its speed attracted his attention.

Treating the motorman, Bray, as defendant's witness, which under the circumstances, he cannot be considered, the foregoing is the case made by the plaintiff in chief, except that it is shown that the plaintiff was a man six feet tall, and that the ditch was two and one-half feet deep, and that while stooping over in the ditch about a foot of plaintiff's back would show above the surface of the earth.

The defendant's case does not aid the plaintiff's case in any respect. The defendant's testimony tends to show that the hole was about five feet deep, and that when the plaintiff was stooping over at his work therein, his back would not show above the surface of the ground, and that according to the written statements of the motorman, given to the defendant immediately after the accident, the plaintiff would not have been injured, and the car would have safely passed over him, if he had remained in the stooping position and had not raised up just as the car got to him. The defendant's testimony further shows, even according to the testimony of Bray, the motorman, all through all of his statements, even upon the trial, that the gong was rung, and was rung five or six times, when within fifty feet of the place of accident. In addition to the foregoing, even in the last statement made by Bray to the plaintiff's attorneys before the trial, after his deposition had been taken, Bray said that he did not see any one in the ditch when he went westwardly, and supposed the men had gone to lunch; and as he returned coming eastwardly within six or eight minutes, he did not expect to find any of the men in the ditch, as he had no idea they had returned from their lunch.

Viewed, therefore, either in the light of the plaintiff's case, or in the light of the whole case, it is manifest that the plaintiff made out no case to go to the jury. All of the evidence for the plaintiff, except that

of the plaintiff himself, shows that, even if the gong was not sounded, he could have heard the approach of the car by reason of the noise it made while running, and this is especially true if the car was traveling at the rate of speed the plaintiff contends was the case. The plaintiff, himself, says he was listening for the car, but did not hear it until it struck him, and that he did not look for the approach of the car because he had allowed his mind to become engrossed with his work, and because he relied upon the motorman to sound the gong and warn him of the approach of the car.

Conceding, then, that the defendant was guilty of negligence in the running of the car, and in not sounding the gong, and that all the other witnesses in the case, both for the plaintiff and the defendant, were mistaken in saying that the noise made by the running of the car could have been heard by any one listening for it, still, the plaintiff himself was guilty of negligence which bars his recovery.

A similar contention was decided adversely to the plaintiff in Wheat v. St. Louis, 179 Mo. l. c. 580, and it was there said: "The contention of the plaintiff that he had a right to have his mind so engrossed in his business that he did not think of the obstruction or thought he had passed it, is wholly untenable. Persons traveling on a highway are charged with the duty to exercise reasonable care to observe and avoid obstructions and defects. They have no right to be so engrossed in their own affairs as to be negligent of their own safety."

The principle underlying that decision is equally applicable to this case.

There is, likewise, no difference in principle between the case at bar and the cases of Davies v. Railroad, 159 Mo. 1, and Evans v. Railroad, 178 Mo. l. c. 517.

In the first case cited, it was said: "The voluntary assumption of a position upon or so near to the

tracks of a street railway, over which cars are run every few minutes, that they cannot pass without inflicting an injury to the party so positioned, unless the intervention of some independent agency occurs to prevent it, is an act in itself of the grossest negligence. . . . The plaintiff had no right to assume a place of danger upon defendant's track and deliberately engage in an undertaking in such a manner as to deprive himself of the benefit of the sense of sight and hearing, the common avenues through which the approach of danger is communicated, and trust that defendant's agents in the course of their employment would be more watchful for his own safety than he himself.''

In the Evans case a judgment for the plaintiff was reversed and a recovery denied, where the deceased voluntarily placed himself so close to the track as to be struck by the passing train, and took no steps to get out of the way of the train, apparently relying upon the section foreman to warn him of the coming train. The court quoted approvingly Davies v. Railroad, supra, and commented upon the fact that it was held in that case, that the court should have declared, as a matter of law that, upon plaintiff's own showing, he could not recover, and it was error to submit the case to the jury, and then added: ''But plaintiff claims that even if the deceased was guilty of negligence, yet if defendant's employes in charge of the train became aware of his peril, or might, by the exercise of ordinary care have become aware of it, in time to have enabled them by the exercise of ordinary care to have averted the injury, and they failed to exercise such care, plaintiff was entitled to recover. It will not do to apply this rule in all of its strictness to section men, whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look to their own personal safety, and to know of the times at which trains pass, to look for them and see them, and to move out of the way. It is of common knowledge that these men

often voluntarily wait until trains get dangerously close to them, and then step out of danger and let them pass by, and to require trains to stop upon all such occasions, when section men are discovered at work on the track, would not only be imposing upon railroads unjust burdens, but would greatly interfere with traffic and travel. Those in charge of trains have a right to presume in the first place that such persons will keep out of danger, and not until they have good reason to believe they will not do so, and then fail to use all proper means at their command to prevent injuring them, in consequence of which they are injured, or are injured by reason of the willful negligence of those in charge of the train, should the defendant be held liable, and there was nothing of that kind in this case. Our conclusion is that the demurrer to the evidence interposed by the defendant should have been sustained.''

The plaintiff, therefore, had no right to permit his mind to become so engrossed in his work as to become heedless of his danger, and as not to take proper precautions to observe the approach of cars. Moreover, the plaintiff says although he was listening, he did not hear the approaching car. This may possibly, but not probably, be true, but the fact remains that all of the other witnesses in the case for both sides, either testified that the gong was sounded within fifty feet of the place of the accident, and again several times while covering that distance, or else, that the noise made by the running of the car attracted the attention of every one else, except perhaps the fellow-workman of the plaintiff, who was also bent over in the ditch on the opposite side of the track. And yet even he raised up and moved away from the track, and the car passed him in safety, and no good reason appears why the plaintiff could not have done the same thing; for even if the testimony of his fellow-workman be true, that he raised his hand and hallooed to the motorman to stop,

nevertheless, no reason appears, or is conceivable, why he could not have done on this occasion, as the testimony of the plaintiff shows the workmen did on other occasions, have stepped back or leaned away from the track, and thus have avoided the injury. It would have taken him no longer to do this than it did to raise his hand and halloo to the motorman to stop, if he did that.

The plaintiff had no right to rely upon the motorman to sound the gong. It may be conceded to be negligence for the motorman not to do so, but it was equally negligent for the plaintiff to remain in a dangerous proximity to the track, and in such position that he could not see the approaching car, and to take no precautions whatever looking to his own safety. Such conduct on his part was clearly contributory negligence and bars his recovery, even conceding that the defendant was guilty of negligence.

These considerations naturally and necessarily lead to the conclusion that the circuit court erred in not sustaining the demurrer to the evidence.

For the foregoing reasons the judgment of the circuit court is reversed. *Valliant* and *Lamm, JJ.,* concur in the second and in the fourth paragraphs, and in the result; *Brace, P. J.,* absent.