IDA DEGONIA v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY; Appellant.

In Banc, December 23, 1909.

1. **NEGLIGENCE: Fellow-Servant: Recovery by Widow.** The engineer and the section hand killed by the train were not fellow-servants; and hence, the question of whether or not the widow of a railroad employee killed by the negligence of a fellow-servant prior to 1905 can recover for his death, is not in the case.

2. **————: Contributory: As Matter of Law: Section Hand on Track.** A section hand who was struck by a regular passenger train running on schedule time should be declared guilty of contributory negligence as a matter of law, if he had worked for a long time in the yards, and, without looking, stepped upon the track when the train was only a short distance away. He was bound not to become so engrossed in his work as to endanger his own safety.

3. ———: ———: **Recovery Only on Humanitarian Doctrine.** Where deceased was guilty of contributory negligence, and the facts of the case will not authorize a recovery on the theory that defendant was remiss in its duties toward him, and his injuries were the result of such negligence, at a time when he was not guilty of any negligence contributing thereto, he can recover only upon some one of the phases of the humanitarian rule, and an instruction authorizing a recovery on the other theory is error.

4. **RECOVERY UPON WRONG THEORY: Affirmance: Nevertheless.** The court will not hold that, although the principal instruction was wrong, yet as the facts show plaintiff has a good case, the error was harmless and the judgment should be affirmed. The case must be disposed of on appeal upon the same theory upon which it was tried below. The court will not assume that the verdict would have been for plaintiff had the jury been properly instructed. A verdict cannot be made to rest upon a theory that was not submitted to the jury.

5. **INSTRUCTIONS: Broader Than Pleadings or Evidence: Contributory Negligence.** An instruction cannot be broader than the pleadings, although the evidence may take a wider range; nor can the instructions be broader than the facts proven, although the pleadings may be. If there is no evidence upon which to submit to the jury the question of whether or not the deceased was guilty of contributory negligence, an instruction authorizing a recovery if he is found not to have been guilty of contributory negligence is error.

6. ———: ———: **Public User.** Where it was not pleaded that the defendant's private fenced switchyards in which deceased section hand was working had been subjected to such long and general use by the public as to establish public user in law and bring home notice thereof to the defendant railroad, and there is no evidence tending to establish any such public user, an instruction authorizing a recovery upon that theory is error, as being authorized neither by the petition nor evidence.

7. ———: **Humanitarian Rule: Section Men: Clear Track.** Where the defendant had a right to expect a clear track, the humanitarian rule cannot be applied in all its strictness in favor of an injured section hand, who is required to look out for his own safety and to know the schedule time of trains.

8. ———: **Station and Crossing Signals: Invoked by Section Hand.** The injured section hand or other employee of the railroad company cannot complain that the station or crossing signals required by the statute were not given. Crossing signals are for persons crossing or intending to cross at a public crossing.

9. ———: **Humanitarian Rule: Necessary Proof.** Where the deceased section hand was struck by a regular passenger train running on schedule time, at a point where defendant had the right to expect a clear track, and deceased was guilty of contributory negligence, as a matter of law, plaintiff, in order to recover, must show that defendant's trainmen actually saw deceased in a perilous position, and saw such things as would lead prudent persons to believe he was oblivious to his peril, and after so seeing him had time by ordinary care to avoid injuring him.

10. ———: ———: **Section Hand.** Trainmen, where the train is entitled to a clear track, have a right to presume that an experienced section hand will not go upon the track without looking for a regular train running on schedule time; and even if they see him on the track they have a right to assume that he will step aside and let the train pass.

Appeal from St. Francois Circuit Court.—*Hon. Chas. A. Killian*, Judge.

REVERSED.

*Martin L. Clardy* and *James F. Green* for appellant.

(1) A clear case of contributory negligence on part of the deceased was shown by the evidence, and the case should not have been submitted to the jury: Evans v. Railroad Co., 178 Mo. 512; Davies v. Railroad, 159 Mo. 1; Wheat v. Railroad, 179 Mo. 572; Riccio v. Railroad, 189 Mass. 358; Aerkfetz v. Humphreys, 145 U. S. 418; Clancy v. Railroad, 192 Mo. 615; McGrath v. Railroad, 197 Mo. 97; Cahill v. Railroad, 205 Mo. 393; Brockschmidt v. Railroad, 205 Mo. 435; Loring v. Railroad, 128 Mo. 359; Fore v. Railroad, 114 Mo. App. 554; Sharp v. Railroad, 161 Mo. 214. (2) Degonia and the train employees were fellow-servants. The right of action given by Sec. 2873, R. S. 1899, is one in favor of the party injured only, and such cause of action does not survive where death ensues. Strottman v. Railroad, 211 Mo. 227; Broadwater v. Railroad,

212 Mo. 437; Sec. 2875, R. S. 1899. (3) Plaintiff's instructions 1 and 2 were erroneous. Defendant's instruction 6 stated the correct rule. Cahill v. Railroad, 205 Mo. 411; Evans v. Railroad, 178 Mo. 508; Loring v. Railroad, 128 Mo. 349; McGrath v. Railroad, 197 Mo. 97; Clancy v Railroad, 192 Mo. 615; Rine v. Railroad, 88 Mo. 392.

*Jerry B. Burks* and *B. H. Boyer* for respondent.

(1) The court committed no error in submitting the cause to the jury. Under the pleadings and all the evidence there was abundant evidence to warrant a verdict for plaintiff. Schlereth v. Railroad, 115 Mo. 87; Heinzeman v. Railroad, 182 Mo. 611; Mills v. Railroad, 199 Mo. 56; Reyburn v. Railroad, 187 Mo. 565; Payne v. Railroad, 105 Mo. App. 155. (2) The above and following cases clearly establish the principle that those in charge of a train are compelled to be on their guard where the presumption of a clear track does not obtain and that failure to look and see is as negligent as seeing and failing to act when the peril is obvious. Eppstein v. Railroad, 197 Mo. 720; Fearson v. Railroad, 180 Mo. 208; Morgan v. Railroad, 159 Mo. 262; Railroad v. Hudson, 110 S. W. (Ark.) 590; Railroad v. Malone, 110 S. W. (Tex.) 958; Ahnefeld v. Railroad, 212 Mo. 280. (3) Each of the instructions given on the part of plaintiff are correct declarations of law, aside from the cases cited under our point 1, under the following well considered cases. Everett v. Railroad, 214 Mo. 54; Waddell v. Railroad, 213 Mo. 8; McQuade v. Railroad, 200 Mo. 150. (4) Instruction 5, refused appellant, was not a correct declaration of law. It ignored the fact that warnings by bell or whistle could have been given and the injury thereby averted. This precise question was passed upon in the Heinzeman case, 182 Mo., supra. (5) Instruction 6, refused appellant, likewise is not the law and the court committed no error in refusing it. In the first place,

under the well considered cases defendant's servants are required to give timely warnings of the approach of a train. This is recognized both in the Heinzeman and Reyburn cases. Secondly, defendant's servants in charge of the engine are required to be on guard to discover persons at or near a point where they are expected to be on the track. This is clearly demonstrated in the Eppstein, Morgan, Everett and Schlereth cases, supra. It is also misleading, as the first impression given by it is that unless the employees could stop the train in time, there would be no liability, and, therefore, narrows the issues as made by the evidence. (6) The deceased, being a section hand, was not a fellow-servant of those in charge of the engine. Schlereth v. Railroad, supra; Sullivan v. Railroad, 97 Mo. 113; Swadley v. Railroad, 118 Mo. 268; McKenna v. Railroad, 54 Mo. App. 161; Heinzeman v. Railroad, 182 Mo. 611.

GRAVES, J.—Plaintiff, Ida Degonia, sues under section 2864, Revised Statutes 1899, for the alleged negligent killing of her husband by one of defendant's passenger trains coming from the north and approaching the depot at Mineral Point, Missouri. The negligence charged in the petition is as follows:

"Plaintiff further states that the injuries to and subsequent death of her said husband as aforesaid was caused by and was the direct result of the wantonness, recklessness and carelessness of defendant's agents and servants in charge of the train aforesaid in this: they negligently ran the said train at a high rate of speed; negligently failed to keep a proper watch or lookout for deceased and other persons or objects in and upon or about the track of defendant at the point where deceased was killed and at the places along such track in the near vicinity thereof; negligently failed to slow up or to stop said locomotive and cars

upon approaching the deceased and upon the discovery of his peril; negligently failed to give any alarm, sound the whistle or ring the bell of the said locomotive aforesaid, and negligently failed to give to deceased and others there present any sort of warning or notice of the approach of said train. And plaintiff avers and states the facts to be that defendant's agents and servants in charge of said train well knew at the time that many persons frequented its track in the vicinity of the station aforesaid, and at other points between the station and the point where her husband was killed, and well knew that deceased and others of the defendant's employees were required to work in and upon the track of defendant at or near the point where he was killed, and well knew that it was highly dangerous and unsafe to lives of persons to run its cars and to manage its train as hereinbefore set forth, or by the exercise of reasonable care could have known all said facts. And so plaintiff says that had defendant, its agents and servants in charge of the said train exercised the care and caution incumbent upon them in the management and handling of the locomotive and cars aforesaid and keeping the proper observance and lookout for the safety of persons who might be upon or about its said track, then the injury to and the death of her said husband could and would have been prevented.''

The answer was a general denial and coupled therewith a count charging contributory negligence. Reply was in usual form.

Upon the trial plaintiff obtained a verdict for $5,000, upon which judgment was entered. After all formal and necessary steps were taken, the defendant appealed the cause to this court.

The case is such that it demands a detailed statement of facts. Mineral Point at the date of the accident in 1904 was an unincorporated village having a population variously estimated at two hundred to two

hundred and fifty inhabitants. The main line of defendant's road runs through said village practically from north to south. Most of the little village is to the west of the railway tracks. The switch yards are practically all north of the depot, although on the east side of the main track are two switch tracks, the east one of which has its southern terminus about opposite the depot, and the west one of which has its southern terminus about two hundred to three hundred feet south of the depot. On the west side of the main line is a switch track which is entirely north of the depot and north of a public road and crossing hereinafter to be commented upon in the course of the statement. To the west of the depot ran what is known as the Potosi branch of the defendant's road, which branch line connected with the switch on the west side of the main line, and after passing the depot took a southwesterly course. Less than five hundred feet east of the depot and defendant's tracks runs what is called Mill Creek, and there is but slight territory between the right-of-way and creek to be occupied by the villagers.

Now to the *locus* of the accident. To the north of the depot was a public road, said by one of the witnesses to be an extension of what is called Fifth Street in the town. This Fifth street is sixty feet in width. At this point the right-of-way is three hundred feet wide or one hundred and fifty feet on each side. At this road crossing the defendant had cross fences and cattle-guards. This is well illustrated by a photograph in evidence, which photograph we incorporate herein at this point as a part of the statement, and mark it "A."

"B"

This photograph was taken so as to show the depot and the, situation to the north thereof. From the center of the depot to the cattle-guard was one hundred feet, and between the depot and the fence shown in the picture ran this public road. From the cattle-guard to the water tank, to the north thereof, it is about two hundred or more feet. To the east side of the main track were three objects frequently mentioned in the evidence, to-wit, the water tank, the pumphouse and the toolhouse, as are best illustrated by another photograph which we incorporate in this statement and mark it "B."

The pumphouse is to the north and is just four feet from the end of the ties on the main line. The tank is about the same distance and the toolhouse is thirteen feet from the east rail of the track. On the west of the railroad tracks and between the right-of-way and the houses was a road or street said to be twenty-five feet in width. We take it from the witnesses, Campbell, Kidd and Trudo, that the company has fencing along its right-of-way north of the cross fences heretofore mentioned. Campbell says that he lives north and west of the depot, and says that Sixth street, three hundred feet north of Fifth street, heretofore mentioned, was closed up and he had to go down this road to Fifth street to get to the railroad tracks. Trudo speaks of having crossed the wire fence on some steps, as he came from his house to the depot on the morning of the accident, and Kidd says: "Well, I don't think there is any private crossing across the railroad. But, there is a private crossing that crosses the wire. That is a little opposite or south of my house. I once put up a pair of steps for my convenience across the railroad and Mr. Potter had it torn down, and the people when they come—they didn't want to go clear up to the county crossing so they kept knocking off the wire fence and the section boss put up the steps again. After you cross the wire fence you can go across the rail-

road anywhere." This was excluded by the court, but the witness did testify that these steps were fifty feet north of the pumphouse.

As further showing the theory of the trial court, the following from the same witnesses was excluded:

"Q. Will you state when the first steps were put there?

"Mr. Green: I object to that as incompetent and immaterial.

"A. While I was working on the road I put it there.

"Q. How long has that been? A. Five years ago. It has been over five years. Mr. Potter, the roadmaster had them taken down.

"By the Court: That is wholly immaterial to this case as to these steps except to locate the place—by this witness to locate the place of the accident, simply by this place."

A further attempt to show user was by the plaintiff's witness, Rush, who said:

"Q. Now, from the nature of where this occurred on around these yards while trains are standing there, will you state to the jury whether or not a number of people are generally standing in and around these tracks? A. Yes, sir.

"Q. At a point north of the road crossing? A. At the depot. Yes, sir, there are people there—these trains coming in and out, north and south.

"Q. North of the railroad crossing, would there be people in there? A. I don't know. I don't know if there is anybody in there. I don't know anything about that because that is railroad property."

A little later after telling about the railroad men being in on this property of the railroad when trains were there, the witness further said upon this question:

"Q. Do you know whether people go up and down that track? A. Yes, sir.

"Q. Isn't that frequently? A. Yes, sir."

This is all there is in this record as to how the tracks were used from the steps fifty feet north of the pump house to the cattle-guards at the public highway crossing.

Going to the accident itself and the point where deceased was when struck, the plaintiff introduced some seven witnesses, all of whom locate the accident within the private grounds of the defendant company.

Henry Trudo says: That he crossed the steps over the wire fence heretofore mentioned; that he saw Degonia as he walked down the track toward the depot, and talked with him four or five minutes; that Degonia was shoveling cinders off of the main track, which cinders had been deposited there by a work train; that he (Trudo) did not see the train strike him; that Degonia was winding around the wheels when he next saw him, thirty or forty steps north of witness. On cross-examination he said that when he stopped and talked with them they were at the toolhouse just south of the tank; that Degonia was shoveling cinders as he passed on south.

Miss Mary Kidd testified in effect that the train was right on Degonia when she first saw it; that she did not see Degonia before she saw the train; that she did not see him on the track at all; that she did not know whether he was on the track before she saw the train; that she didn't see Degonia at all until just the moment the train struck him; that Degonia was facing toward the depot.

B. Walton says that he did not see Degonia struck, but saw him taken out from under the train at a point thirty or forty yards north of the crossing.

Joseph Boyer says that he first saw the train as it reached the pumphouse; that he then saw Degonia in the middle of the track with a shovel taking out cinders or something; that he was "kinda" facing the depot; that the train was twenty or thirty yards from

him; that it might have been less or more than that distance; that he did not see Degonia before he saw the train. A little further on in his examination he said: "When I first seen him the train seemed to be a little distance from him. It looked to me like four or five feet. It looked to me like he started to jump and the train run under him and he tried to grab the pilot and he rolled off on the west side."

William Brant says that the first he saw of the deceased he was winding in the wheels; that he had already been struck.

Joseph Higgins described the incident thus:

"Q. Did you see the train strike Mr. Degonia? A. Yes, sir.

"Q. At that time, tell the jury whether or not any signals were being given? A. No, sir, I never heard any.

"Q. Or after it struck him? A. None that I heard of before or after either.

"Q. Where was Mr. Degonia when you first seen him? A. Why, he was between the water tank and the toolhouse.

"Q. Between the water tank and the toolhouse? A. Yes, sir.

"Q. How near to the railroad track? A. When I first noticed him he was going on the track, when I seen him. That is what drawed my attention to him. I was looking down the track.

"Q. You mean he was going over there to the track? A. Yes, sir.

"Q. After he got on the track what position did he take? A. Kinda had his back toward the train, bent over shoveling or scraping cinders, I don't know which. He was bent over at the time and the train run up within four or five feet. He kinda looked over his right shoulder and he jumped.

"Q. Did you observe him when he first came on the track? A. Yes, sir.

"Q.  How close was the train to him at that time, Mr. Higgins?    A.   To the best of my knowledge, fifty or sixty yards."

On cross-examination, the witness further says:

"Q.   You went there for the purpose of going off on that train?    A.   Yes, sir.

"Q.   And looked up at some period of time and saw the smoke of the train, did you?    A.   I had been watching for the train.

"Q.   You had been watching for the train?    A. Yes, sir.

"Q.   You then saw the smoke of the train?    A. Yes, sir.

"Q.   And watched it come in?    A.   Yes, sir.

"Q.   It was in plain view?    A.   Yes, sir.

"Q.   You could see it all the time?    A.   I seen it for about two hundred yards.

"Q.   It was coming south?    A.   Yes, sir.

"Q.   When you saw the train coming south, Mr. Higgins, you say Mr. Degonia was over here somewhere?   (Handing witness diagram.)   A.   He was right along here.

"Q.   Right along here?    A.   Yes, sir.

"Q.   That is, he was south of the tank here?    A. Yes, sir.

"Q.   Now, that train was coming on down there, you saw him walk over here toward the track with a shovel?    A.   Yes, sir.

"Q.   Then he came down that way you say with his back to the train?    A.   Yes, sir, bent over.

"Q.   Bent over with his back towards the train? A.   Kinda with his back and side toward the train.

"Q.   Back and side towards the train?    A.   Yes, sir.

"Q.   He was reaching down for some cinders?    A. Yes, sir.

"Q. Where were these cinders? A. Right along here.

"Q. Did you notice him before that working there, working at these cinders? A. I seen him down there. I ain't positive that he was working on them.

"Q. He would take them away and come back? A. Yes, sir.

"Q. Come back for some more? A. Yes, sir.

"Q. You saw him come from in here; he come from along the track up to the track? A. Yes, sir.

"Q. Along the track? A. Yes, sir.

"Q. And got up a shovel of cinders? A. Yes, sir.

"Q. He was in that stooping posture? A. Yes, sir.

"Q. So that when the train was in four or five feet he suddenly looked up and back? A. It may have been a little further. It looked a very short distance.

"Q. From where you were it didn't look to be more than eight or ten feet? A. Yes, sir.

"Q. Then he looked up—didn't he look up and just kinda throw his head around? A. Yes, sir.

"Q. That was the first time you saw him look up? A. Yes, sir.

"Q. When he was stooping down in that posture, that is, with his face and side—his face was towards the depot, wasn't it? A. Yes, sir.

"Q. That is, the front of his face was in that direction? A. Yes, sir; he was kinda facing the depot.

"Q. He was kinda facing the depot? A. Yes, sir.

"Q. He stood there in that position for about how long, would you say? A. Just a very short time.

"Q. Just a short time and the train was on him? A. Yes, sir."

Chris F. Childers says that when he first saw deceased he was balanced on the cowcatcher with his hands thrown up; that he looked as if the train just hit him; that he fell to one side and rolled under the wheels.

The testimony further shows rather conclusively that no whistle was blown at the station whistling post north of the town about a mile, nor none blown at the crossing whistling post just north of the railroad yards. It also shows no bell was ringing and no danger signals were given to Degonia.

It also appears that there were two trains awaiting the arrival of the train which struck Degonia. The Potosi branch train was on the west side and a freight train going north was on one of the east side tracks.

The train which struck Degonia was a regular fast passenger train making but few regular stops, but Mineral Point was one of them. It was on time that day and stopped at the depot in the usual way and at the usual place.

Degonia had been working for the company in the yards for a long time, and possessed good sight and hearing. Several of the witnesses did not see nor hear this train until about the point of the accident. At the point of the accident the train was running at the rate of twelve miles per hour. This rate of speed is from the defendant's engineer.

Defendant's evidence was as follows: By the trainmen it was shown that the usual signals were given at both whistling posts, and that the bell was ringing as they approached the station. The attending physician said that the character and position of the wounds indicated that the deceased had his back to the train.

The evidence both for defendant and plaintiff shows that a person standing at the tank could see an approaching train from two to three hundred yards, and that the trainmen could likewise see a man on the

track that far.   That a further view of the train was precluded by a curve in the track.

For defendant, John Emmons says that a minute or so before the time of the accident he was standing in the pump house door looking south; that he saw Degonia at the time about eight feet south of the base of the water tank; that he was scraping up cinders and fine coal on the east side of the track and taking them over to the west side of the Potosi track; that the usual place to take them was to the east, but this was not done at the time, because there was a freight train there.  He then further described the incident thus:

"Did you see Mr. Degonia a minute or two before the train struck him?   A.   Yes, sir.

"Q.   Tell the jury what he was doing, if you know? A.   When I first saw him he was scraping around, piling up this stuff and he run his shovel under it, facing south, run his shovel under it, turned a quarter around and started to walk across the main line.

"Q.   Started to walk across the main road?   A. Yes, sir.

"Q.   In which direction was his back at that time? A.   It would throw his side, right side, next to the north and his face west.

"Q.   Face west?   A.   Yes, sir.

"Q.   As he started to walk across did you see him stoop down?   A.   No, sir.

"Q.   You didn't see him stoop down after that? A.   No, sir.

"Q.   He went on and started to walk across, what happened then?   A.   From where I was standing it looked to me like he stepped on the track six or eight feet ahead of the engine; that is all I could see."

He further said the pumphouse was one hundred feet from the tank; that he did not notice or hear the train until it came by him; that it stopped within its length, which by other witnesses was shown to be eight cars and the engine and tender; that he was watching

the pump in the absence of the regular man who had gone after the mail; that he was not then in the employ of the defendant, but was at date of trial.

By J. B. Bone it was shown that he was just returning from a hunt; that when he first looked up the track and saw the train, the train was beyond the pumphouse something like a hundred yards; that he never saw any person in the vicinity of the tank at that time; that when he looked again he saw Degonia and the train right close to him; that he did not see Degonia when he saw the train one hundred yards north of the pumphouse, but could have seen him had he been on the track at that time.

By Fred Day it was shown that he was in the toolhouse at the time of the accident; that he saw Degonia about two minutes before he was hit; that deceased came and asked for a scoop and took it and witness did not know where he went from there; that he was working for the company at the time, but at the date of trial was working in the tiff mill in Mineral Point.

By Miss Richards it was shown that the deceased was struck by the train at a point just a little way south of the tank; that deceased was up in the air when she first noticed him.

W. S. Wood, the engineer on the Potosi branch train, says that he had his engine up at a water crane to the west of the tank taking water; that he saw the train on the main line coming in; that he saw Degonia just before this going across the Potosi branch track with a shovel of cinders and saw him come back with an empty shovel; that he went toward the main track and the tank with the empty shovel; that he saw him last near the tank; that he saw him no more until after he was struck.

A. C. Brennecke, the engineer in charge of the engine which struck deceased, says that after he got around the curve upon the straight track there was

nothing to obstruct his view; that he could have seen a man on the track had one been there; that he was looking forward all the time and did not see deceased; that if deceased started across the track from the east side thereof eight or ten feet ahead of his engine, he being in the engineer's place on the west side of the engine, could not have seen him, because his view that close to the front of his engine would be obstructed by the engine itself. He further states that he could have stopped his train with safety to his passengers within one hundred and fifty to two hundred feet, and by use of the emergency in about one hundred feet, but such emergency stop would have thrown the passengers from their seats.

Frank Lagree, the fireman on the engine that struck deceased, after stating that he was ringing the bell from the time the train whistled for the road crossing up to the time Degonia was struck, but not afterward, detailed the accident as follows:

"A.  After we hit Degonia I left the bell cord and told the engineer that we hit him.

"Q.  You left the bell cord? · A.  Yes, sir.

"Q.  Did you see the engine strike him? A.  I didn't see it strike him, but I saw him on the track in front of it.

"Q.  Where did he step from? A.  South of the tank.

"Q.  Now, here is a picture marked 09111, showing the toolhouse, and the tank, as you look at the picture it is looking south, now show to the jury about where the engine was with reference to the man stepping on the track? A.  This is coming into Mineral Point?

"Q.  Yes, sir. A.  The man was standing down in here somewheres nearby, below the tank, and he stepped out in front of the engine right here.

"Q.  He stepped out from here? A.  Yes, sir.

"Q.  From behind the tank there? A.  Yes, sir,

he was in between the rails and the tank with a shovel, whether he had anything in it, I don't know. He stepped in front of the train, that is, the train was four or six feet behind him.

"Q. Had you seen anything of that man before he stepped on the track that day? A. Yes, sir.

"Q. Where did you see him? A. He was standing down below the tank with his shovel in his hands.

"Q. When? A. The day that it hit him.

"Q. Had you ever seen him before? A. I never had seen him before.

"Q. When you first saw him then, he was not on the track? A. No, sir, he was not on the track, he was in the clear.

"Q. How close to the track was he? A. Four feet away, four or five feet away from the rail.

"Q. Was there anything in his manner at that time indicating that he was going to go over on the track? A. No, sir, it didn't look that way to me.

"Q. It didn't look that way to you? A. No, sir.

"Q. Now then, about how far were you from him when you first noticed him there? A. We were above that pumphouse when I first seen him standing down there.

"Q. Just seen him standing there? A. Yes, sir.

"Q. Now, after you passed the pumphouse—you may tell when you first saw him move? A. He wasn't more than six feet away when I saw him come towards the track, and we couldn't stop the train then.

"Q. You say about six feet away when he moved and come on the track? A. Yes, sir.

"Q. Did he have anything in his hands? A. He had a shovel.

"Q. How was his face? A. It seemed to me like it was towards the southwest.

"Q. He was looking southwest? A. Yes, sir."

By the conductor, John Dates, it was shown that Brennecke was an engineer of long experience and was competent and careful. He also testified as to there being eight cars in the train; that it stopped at the usual place.

By the station agent, Howell, it was shown that from the depot you could see up the track north a quarter of a mile.

The testimony of Bush, the brakeman, lends but little light. He and all the train men say that deceased was taken from under the train at a point some fifty feet or more north of the cattle-guard.

At one place in examining the defendant's witnesses plaintiff's counsel calls the place north of the cattle-guard "that enclosure," indicating, as the fragments of the evidence from several of the witnesses and the picture "A" indicate, that the switchyards to the north of the public road were enclosed.

This in substance is the evidence upon the vital points in this case, and we have made it full and complete upon these points.

Defendant's demurrers to the testimony interposed at the close of plaintiff's case and at the end of all the testimony were overruled.

For the plaintiff the case was submitted to the jury upon the following two instructions:

"1. You are instructed that if you shall find from the evidence that Joshua Degonia was the husband of plaintiff at the time he was run upon and killed by defendant's locomotive and cars, and that at the time he was killed he was an employee of defendant and as such engaged in the performance of the duties incumbent upon him as such employee and shall further find that his death was directly caused by defendant's agents and servants, in charge of its passenger train, negligently running upon and over him without giving him any notice or warning of the approach of said train and shall further find that defendant's agents

and servants in charge of said train knew, or by the exercise of reasonable care could have known that said Degonia was upon the track, or so near thereto as to be in danger of being struck by said train, in time to have warned him of the approach of said train by blowing the whistle or ringing the bell and thereby have prevented his injury and death, and shall further find that the death of the said Degonia was not the result of any negligence on his part directly contributing thereto, then your verdict should be for the plaintiff. And you are further instructed that if you find for plaintiff you should assess her damage at the sum of five thousand dollars.

"2. You are further instructed that if you shall find from the evidence in the cause that at and near the point where plaintiff's husband was killed, persons were liable to be in and upon defendant's track or roadbed and that defendant's servants handling its train of cars knew it, or by the exercise of reasonable care could have known it and shall further find that the view of said road at and near the point where deceased was killed was open and unobstructed to defendant's servants in charge of its trains, in approaching the station from the north, then you are instructed that it was the duty of defendant's servants in charge of its passenger train to use reasonable precaution in looking for persons or other objects that may be upon its track and to warn them of the approach of its train."

Defendant's instructions in so far as may be necessary will be noted in the course of the opinion. The foregoing sufficiently and thoroughly states the facts of the case.

I. Defendant contends that the cases of Strottman v. Railroad, 211 Mo. 227, and Broadwater v. Railroad, 212 Mo. 437, settle this case and their demurrer to the evidence should therefore be sustained, because

prior to the Act of 1905 the widow of an employee negligently killed by a fellow-servant could not recover. In other words the Fellow-Servant Law of 1897 only gave a right of recovery to the injured servant and not a right of action to the widow of said servant if perchance he was killed. The Broadwater case simply followed the Strottman case. In the Broadwater case there was no serious contention that the deceased and the negligent servant with him were fellow-servants, but in the Strottman case the question was one of doubt upon the part of several members of this court. But however that may be we haven't the facts of the Strottman case here. It can hardly be said that a mere section-hand is a fellow-servant with the engineer of the train. It was never so held prior to the Act of 1897, nor do we think that act makes them fellow-servants. So as to this point the court did not err in overruling the demurrer. There is another question or two raised by the demurer which will be discussed before closing the opinion.

II. The petition in this case is broad enough to authorize a recovery upon one of four theories under the law, accordingly as the facts may warrant; (1) that the defendant was negligent and the deceased was not guilty of negligence contributing to his injury; (2) that deceased was negligent and the defendant was not negligent, but notwithstanding the fact of deceased's negligence, yet if the defendant was apprised of the fact that deceased had placed himself in a position of peril, and was oblivious thereto, in time to have averted the injury, by the exercise of ordinary care, and did not prevent it, plaintiff could recover; (3) if the place of accident was one where the defendant had no right to expect a clear track, and deceased by his own negligence had placed himself in a place of imminent peril and was oblivious thereto, and the defendant was apprised of that fact in time to save him by the exercise

of ordinary care upon its part, or if the defendant through its agents, by the exercise of ordinary care upon their part might have seen deceased, whether they did so see or not, then the plaintiff would be entitled to recover; and (4) if both defendant and deceased were at the time negligent, and the deceased by his negligence had placed himself in a position of imminent peril and was oblivious thereto, and the defendant knew of such perilous position. or might have known of the same by the exercise of ordinary care (the latter being applicable only where defendant had no right to expect a clear track) in time to have averted the injury to deceased, by the exercise of ordinary care upon its part, and did not do so, then plaintiff would be entitled to recover.

The latter three are but different phases of the so-called humanitarian doctrine, which doctrine has of recent years developed into an exception both to the time-honored doctrine of contributory negligence and the equally time-honored doctrine of concurrent negligence, as we understand it.

In the case at bar under the plaintiff's proof the court should have declared as a matter of law that the deceased was guilty of contributory negligence. He had worked for a long time in these yards. The train that struck him was a regular train and running on schedule time. He knew the time of the train and the direction from which it was coming or as an experienced employee will be presumed to have so known. He was in duty-bound not to become so engrossed in his own work as to endanger his own safety. Yet with his back toward an incoming train, without any precaution whatever, he continues his work. I shall not elaborate upon this, because the evidence is too clear to require elaboration. [Davies v. Railroad, 159 Mo. 1; Evans v. Railroad, 178 Mo. 512; Wheat v. St. Louis, 179 Mo. 572; Clancy v. Railroad, 192 Mo. 615; McGrath v. Railroad, 197 Mo. 97; Cahill v. Railroad, 205

Mo. 393; Brockschmidt v. Railroad, 205 Mo. 435; Riccio v. Railroad, 189 Mass. 358.]

Then there is left but one theory upon which this case could have been submitted to the jury, if it should have been submitted at all, and that is upon some one of the different phases of the humanitarian rule. Instruction numbered 1 for the plaintiff undertakes to and does cover the whole case, and directs a verdict for plaintiff if the facts therein recited be found in her favor. This instruction does not proceed upon the theory of the humanitarian rule. It does not invoke that doctrine, but on the contrary it invokes the old time-honored doctrine that defendant had been remiss in its duties toward the deceased, and the injury done was the result of such negligence, at a time when deceased was not guilty of any negligence contributing to his own injury. The facts of the case did not authorize the submission of the case to the jury upon that theory of the law, and the instruction is erroneous.

But it is urged that although the instruction is erroneous, yet as the facts show that the plaintiff has a good case, we should hold the error harmless and affirm the judgment. We should not so hold. We have uniformily held that where a case is tried *nisi*, upon a certain theory, that it must be heard and tried here upon that theory. We have held the bar of the State in all strictness to this rule. If additional suggestions and additional theories were advanced here, we have brushed them aside, with the statement that such were not the theories adopted in the trial below. Having held the bar in strictness to the rule, shall we ourselves violate it by saying, although the case was never tried and submitted on a proper theory of the law, yet we think there is a good case on the facts, and we will affirm the judgment, although the jury has never been permitted to pass upon the facts when coupled with proper declarations of law? What a jury might

have done, if properly instructed, is, to say the least
problematical. The jury might have found as it did,
or it might not have so found. For us to affirm this
judgment, one admittedly secured upon erroneous in-
structions, amounts, in fact, to a usurpation of the pro-
vince of the jury when properly instructed. If plain-
tiff has a meritorious case she will sustain no injury
in having her case and the facts thereof properly sub-
mitted under the law applicable to the case. The rule
which we with strictness apply to the bar with the
same strictness we should apply to ourselves. The sole
question now under discussion is, can a plaintiff by the
principal instruction submit a case to a jury upon an
erroneous theory of the law, secure a verdict, and have
it sustained, on the ground that there is or was a theory
of the law upon which under the same facts the case
could have been submitted and a verdict obtained which
would stand? We know the books are full of cases where
we have said, and rightly said, that instructions were
erroneous, but that the error was harmless, and the
judgments were affirmed. But does this apply to the
principal instruction of the case? Does this rule ap-
ply to a case where the jury has never passed upon
the facts whilst properly instructed upon the only
theory of the law upon which a recovery could be had?
Does this rule apply where the only theory upon which
plaintiff could recover has never been submitted to a
jury? We think not. This rule in our judgment only
goes to errors in instructions on collateral issues, and
not to the principal instruction, which outlines the
theory of law upon which recovery is sought.

But, further, an instruction cannot be broader than
the pleadings, although the evidence may take a wider
range, nor on the other hand can the instruction be
broader than the facts proven, although the pleadings
may take a broader range. In other words the instruc-
tion must be within the purview both of the pleadings
and the evidence. [Mansur v. Botts, 80 Mo. 658; Bank

v. Murdock, 62 Mo. 70.] There was no evidence in this case upon which to submit to the jury the question that deceased had not been guilty of contributory negligence, so that an instruction so submitting that question was not only beyond the purview of the proven facts, but was confusing and misleading.

The giving of this instruction would at least demand a reversal and remanding of the cause, to the end that it might be submitted to the jury upon instructions covering the only theory of the law upon which recovery can be had, if had at all.

III. The second instruction is absolutely erroneous both under the petition and the evidence. The instruction is drawn upon the theory that the railway right-of-way at the point where deceased was killed, had been subjected to a use by the public and that defendant had knowledge or notice thereof. Such use is not pleaded, nor is it proven. We have set out at length all the testimony tending to show such use, and it falls far short of what the law requires. We are cited to the case of Eppstein v. Railroad, 197 Mo. 720. Upon page 734, Lamm, J., discusses the character of evidence required to show user and the bits of testimony in this case fall far short of the standard there fixed.

In a later case, Frye v. Railroad, 200 Mo. l. c. 400, the same judge in speaking of cases of user, outlines the requirements to show public user in this language: "In such a case, out of tenderness and regard for limb and life, it has been held that where the general public have been invited to use the track by the tacit consent and long acquiescence of a railroad company in permitting the open, known, free, continuous and extensive use thereof by footmen, then it owes a duty to such footmen to use ordinary care to look out for them and ordinary care to protect them from being run down and maimed or killed."

There was no public user shown by the evidence

in this case and this instruction predicated thereon was error. It requires more than the scattering facts in this record to show user, under the law. No case cited by plaintiff is contrary to the views expressed in the two cases above. In Ahnefeld v. Railway, 212 Mo. 280, cited by plaintiff, Fox, J., cites with approval both of them. The plaintiff having failed to establish such long and continued public user of the railway tracks as to bring home notice thereof to defendant was not entitled to this instruction. On the contrary, the evidence shows that these were the private yards of the company, and not only so but that they were fenced. We call now attention to a fact that we overlooked in the statement and that is the picture marked ''B'' in the statement shows the fence along the west side of the right of way.

For this erroneous instruction, the case will at least have to be reversed and remanded.

IV. We return now to the demurrer to the evidence mentioned in the first paragraph of this opinion, which paragraph disposed of one question covered by the demurrer, and disposed of it adversely to defendant's contention. But defendant insists that leaving out of view the doctrine of the Strottman case, yet the evidence fails to make a case for the plaintiff. To reach a conclusion we will proceed by a process of elimination.

(a). The evidence fails to show such a user by the public of its railroad tracks between the crossing whistling-post and the public crossing, as would justify us in saying that the defendant was not entitled to expect a clear track. On the contrary the defendant had a right to expect a clear track until the public crossing was reached. Because section hands may be scattered along the railroad tracks from one station to the other, does not deprive defendant of the right to rely upon a clear track, and this for the reason that

such employees are bound to look out for their own protection. The rule as to an employee is different from the rule applied to a passenger or stranger. [Cahill v. Railroad Co., 205 Mo. l. c. 408; Evans v. Railroad, 178 Mo. l. c. 517.] A stranger, however, would not have been protected under this evidence.

But leaving off the details on this point, when plaintiff failed to both plead and prove a public user of such tracks, the doctrine of a clear track follows and defendant under such circumstances cannot be held liable unless it be shown that its servants in control of the engine actually saw the deceased in a position of peril, of which position he was oblivious, in time to have averted the injury by the exercise of ordinary care.

It is well known to all that section men often remain upon the track until the train is dangerously close, and then by a quick step put themselves in the clear. The engineer has a right to rely upon such fact, as well as the further fact that such men know the time of trains and are expected to protect themselves. For these reasons the rule invoked—the humanitarian rule —cannot be applied in all strictness to section men, as held by this court and the United States Supreme Court.

(b). Deceased had no right to rely upon the station or crossing signals. Crossing signals are not for employees, or for persons not crossing or intending to cross at a public crossing. This has long been the rule in this State.

In the early case of Rohback v. Railroad, 43 Mo. 187, it was held that employees did not fall within the purview and meaning of such statute, and that a failure to comply with such statute was not negligence toward an employee, who was in that case a laborer on the tracks at the foot of Jefferson street in Jefferson City.

Later in case of Bell v. Ry. Co., 72 Mo. l. c. 58, this court said: "The third instruction is also objected to

on the ground that it had nothing to do with the case. We concur in this view, although its impropriety alone would scarcely justify a reversal. The statute which requires the bell to be run or the whistle sounded was for the benefit of persons at the road crossing or approaching it; but the boy killed in this case was not on the road, or at the crossing, but forty or sixty feet west of it.'' This third instruction related to the duty of trainmen under the statute as to whistling and ringing the bell. The boy was not an employee, but a stranger, therefore a much stronger case than the one at bar as to the duty of ringing the bell and blowing the whistle. Not only so but he was but forty to sixty feet from the crossing.

To a like effect is Evans v. Railroad, 62 Mo. l. c. 58, which case cites and approves the Rohback case, *supra*.

As to whom this statute is intended to apply is well expressed by MACFARLANE, J., in Burger v. Railroad, 112 Mo. l. c. 246, thus: ''It is argued, we think correctly, by counsel for defendant, that the duty of giving the statutory signals of ringing the bell or sounding the whistle, has no application to one, situated as plaintiff was, in the middle of the train and between two cars, but was intended to give warning of the approach of a train to persons who might be crossing, or intending to cross, the railroad over a public highway. Indeed, the language of the statute admits of no other construction.''

That such a statute was not meant to apply to persons other than persons crossing or intending to cross at a public highway is fully and ably discussed in the recent case of Everett v. Railroad, 100 Minn. 309. Judge ELLIOTT in that case reviews the authorities *pro* and *con*, both cases and text-books, and reaches the conclusion long since reached by this court. Among

the great list of cases discussed by him are the cases hereinabove cited from this court.

The failure to sound the whistle or ring the bell was therefore a thing of which the plaintiff cannot complain, because deceased was not one of the class covered by the statute. The language of the statute settles the question outside of case law. It limits the place whereat the defendant's liability for damages arises. The statute says: ''A bell shall be placed on each locomotive engine, and be rung at a distance of at least eighty rods from the place where the railroad shall cross any traveled public road or street, and be kept ringing until it shall have crossed such road or street, or a steam whistle shall be attached to such engine and be sounded at least eighty rods from the place where the railroad shall cross any such road or street, except in cities, and be sounded at intervals until it shall have crossed such road or street, under a penalty of twenty dollars for every neglect of the provisions of this section, to be paid by the corporation owning the railroad, to be sued for by the prosecuting or circuit attorney of the proper circuit, within ten days after such penalty was incurred, one-half thereof to go to the informer, and the other half to the county; and said corporation shall also be liable for all damages which any person may hereafter sustain *at such crossing* when such bell shall not be rung or such whistle sounded as required by this section: Provided, however, that nothing herein contained shall preclude the corporation sued from showing that the failure to ring such bell or sound such whistle was not the cause of such injury.'' [Sec. 1102, R. S. 1899.] The words ''at such crossing'' would have to be stricken from the statute to allow plaintiff to rely upon it in this case.

(c). Now under the evidence and the law it thus far appears, (1) that defendant had a right to expect a clear track at the point of injury, and under no theory of the law can it be held liable unless defendant's ser-

vants actually saw deceased in a perilous position, and further saw that he was oblivious to such perilous position, in time to have averted the injury by the exercise of ordinary care, (2) that as to deceased there was no negligence in failing to whistle for the crossing or to ring the bell thereafter, and (3) that the servants at such place were not compelled to be on constant watch for persons on the track at such place.

Plaintiff's case therefore must proceed upon the theory that defendant's servants saw the perilous position of the deceased, and saw such things as would lead prudent persons to believe that deceased was oblivious to such perilous position, and after so seeing had time to obviate and avoid the accident by ordinary care and caution upon their part. It devolved upon the plaintiff to show these facts. Has she so done? Going to the testimony there are but two witnesses upon whom she can depend. She cannot depend upon Trudo, because he does not pretend to locate deceased, just the minute before the accident. He, it is true, says that as he passed deceased was shoveling cinders from the center of the track, but does not say he was on the track. In fact when this witness talked with deceased he was by the toolhouse and not on the track at all; after he had gone thirty or forty yards, he looked back and deceased had been struck, so that deceased must have gotten upon the track at some time whilst this witness was taking thirty or forty steps, counting that he covered three feet at a step. All the other witnesses are valueless on the crucial question except Higgins and Boyer. Higgins saw deceased when he was off of the track and south of the toolhouse. He says, corroborating defendant's witnesses, that deceased had been going to and from the cinder pile in doing his work. That deceased with his back toward the train started from the tank to the track, and bent over on the track with his face "kinda" toward the depot. That

he thought the train was fifty or sixty yards from him at that time. Now grant that defendant's servants saw him start toward the track, they had a right to presume that an experienced section man would not go upon the track without looking for the train, and even if they later saw him on the track they had a right to presume that he would step aside, as section men often do, and let the train pass. But, further, if the train was running twelve miles per hour as the evidence shows, it would cover 352 yards per minute or about six yards per second, so that there were but ten seconds in which to act. Yet defendant is held liable for not saving a life, with only ten seconds—ten ticks of the watch—in which to act.

Boyer says deceased was on the track and the train at the time was twenty or thirty yards from him. So that, under this testimony, even if it be shown that defendant's servants saw deceased, yet there was not time in which to stop the train, and I do not understand that it is contended that there was negligence in not stopping the train, but it is urged that a signal by whistle should have been given, and that this was not done, and that in this consists the negligence. Plaintiff is not without authority for this position: Hinzeman v. Railroad, 182 Mo. 611, and Mills v. Railroad, 199 Mo. 56, the latter being the same case upon second appeal, and in the meantime Mrs. Hinzeman had married Mills. Is the defendant liable for this failure of the engineer?

In Riccio v. Railway Co., 189 Mass. 358, where the deceased was shoveling snow in the switch yards of the defendant with snow still falling and was struck and killed by an engine, the Supreme Court of that State said: "We see no negligence on the part of the defendant. The plaintiff knew that he was at work in a railroad yard where trains and engines are frequently passing. There was no undertaking upon the part of the defendant to give him warning, but he was expected

to look out for himself.  If the engineer failed to sound the whistle or ring the bell, it was not negligence for which the defendant was responsible.  Both by the common law, and by the law of the State of Connecticut as we understand it to be under the decisions of that State which were put in the case as evidence, there is no evidence of negligence of the defendant.  [Morris v. Railroad, 184 Mass. 368; Whittlesey v. Railroad, 77 Conn. 100, and cases cited.]''

The above language was quoted and approved by the unanimous vote of Division Two of this court in the very recent case of Cahill v. Railroad, 205 Mo. 411, the opinion being written by Judge BURGESS.

There can be no negligence without there being some duty to be performed toward the injured party. The Massachusetts court puts it well.  When a section man is employed, the character of his work is a warning to be upon the lookout.  As said by that court, the common law does not demand warning and in Missouri we have no statute demanding such, then wherein comes the rule of law announced in the Hinzeman case.  In Aerkfetz v. Humphreys, 145 U. S. l. c. 419, Mr. Justice BREWER says:  ''Upon these facts, we observe that the plaintiff was an employee, and, therefore, the measure of duty to him was not such as to a passenger or a stranger.''  This language is likewise quoted and approved in the Cahill case, *supra*.

So too, is the rule in the Evans case, 178 Mo. 508. In the Evans case, the foreman of the section crew was present.  Yet it is said in that case upon the question of warning:  ''It was not the duty of the section foreman to warn section hands that a train was coming, even if he saw it.''  Whilst it is true the court says in that case the engineer gave signals, but it does not say there was an incumbent duty for the engineer so to do, but it does say as to warning Evans of the approaching train, there was no duty upon Evans's

superior, the section foreman, to give him warning, even if the foreman knew of the approaching train.

So, too, in the recent case Brockschmidt v. Railroad, 205 Mo. l. c. 444, Fox, P. J., uses this language: "Taking the strongest possible view of the testimony in this case in favor of the plaintiff, and conceding for the purposes of this case that the motorman did not sound the gong or ring the bell, if we are to follow the rules as announced by the very recent well-considered cases upon the subject, there can clearly be no recovery in this proceeding." In that case the deceased was removing dirt from one of defendant's railroad tracks with his back to the direction from which the cars were expected. The humanitarian rule was invoked. Testimony tending to show a failure to warn by bell or gong was given for the plaintiff. Learned counsel for plaintiff pressed the humanitarian rule with his usual vigor, well known to this court. In the course of his argument he said of the deceased: "He had a right to expect at least some notice of an approaching car and that he would not be run down whilst so at work, without warning. Hence, we do not think that the failure of deceased to keep a sharp lookout for the car can be called gross negligence, as appellant asserts in its brief; but conceding, as said, that he was to a degree negligent in failing to keep a constant watch behind him whilst at work, is it the law that such negligence defeats the right of recovery where, as the plaintiff's evidence shows, he was in plain view of the motorman of the car whilst he runs down his car upon him without warning, except a halloo when the car was within eight or ten feet and too late to stop the car and allow him to escape? We submit that such is not the law of this State." Yet with the question of warning to a delinquent section man fairly before the court, the language above quoted determined the issue against the contention of warning. The court quotes with approval and as a basis for this ruling the cases of Davies

v. Railroad, 159 Mo. 1; Evans v. Railroad, 178 Mo. l. c. 512; Clancy v. Railroad, 192 Mo. 615; Wheat v. St. Louis, 179 Mo. l. c. 580. To these might have been added McGrath v. Railroad, 197 Mo. 97.

The essence of these cases, which in my judgment conflict with the Hinzeman case, supra, is (1) that the humanitarian rule cannot be applied in its strictness to employees working on the road, and that as to them the rule is different from the rule as to passengers or strangers; (2) that it is the duty of the employee working on the track not to place himself in such position that he cannot see an approaching train, and if he does so place himself he is guilty of such negligence as will preclude his recovery although defendant's servants failed to warn him; and (3) that it is the trackman's duty to protect himself from approaching trains and not permit himself to become so engrossed in his work as will prevent him from protecting himself.

In the case at bar, deceased knew that a train was due; he knew it was coming from the north; very shortly beforehand he leaves a place of safety and assumes a place of danger, with his back to the north, from whence he knew a train was coming; there is no evidence that the engineer saw him, but on the contrary, that he did not see him; from the evidence he never looked to the north for a train; he saw the freight train on the siding right where he was working waiting for this train from the north; he saw the train on the Potosi branch waiting for the same train, and with all this before him, having the imposed duty of watching out for his own safety, he assumes a place of peril, as one of plaintiff's witnesses puts it, when the train was within fifty or sixty yards of him and in plain view, and this too without looking to the north.

As we view the weight of authority in this State, plaintiff is precluded from a recovery herein because of the negligence of deceased, and as we view the law

and the facts the humanitarian rule in none of its phases has a place in the case.

So believing, this case should be and is reversed.

*Burgess* and *Woodson, JJ.*, concur *in toto; Fox, J.*, concurs in all of the opinion and the result, except he expresses no opinion as to whether or not there is a conflict between the Evans and other cases cited in this opinion; *Gantt, J.*, concurs in the result, and all of the opinion except what is said concerning the Hinzeman and Mills cases, and he is of opinion there is no conflict between these cases and the Evans and other cases mentioned in the opinion. *Valliant, C. J.*, and *Lamm, J.*, dissent.